# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TF, BY HIS GUARDIAN, LISA ELLERN-
FELDMAN,

                          Plaintiff,

    v.                                          No. 1:23-cv-03612-CJN

DISTRICT OF COLUMBIA,

                          Defendant.

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 5

    A.    TF Requires Specialized Education Support ........................................5

    B.    The 2022 and 2023 IEPs Were Deficient ...........................................7

        1.    The March 9, 2022 IEP ........................................................... 7

        2.    The May 3, 2023 IEP ............................................................. 9

    C.    TF's Public Placement Environment Is Inadequate ...........................12

    D.    TF Files Administrative Complaint Challenging His Deficient IEPs ...................13

    E.    The HOD Confirmed that DCPS Had Failed to Provide a FAPE But Did Not Order Meaningful Relief ...........................................................14

ARGUMENT ....................................................................................................... 16

I.    SUMMARY JUDGMENT UNDER THE IDEA ......................................... 16

II.    THE COURT SHOULD CONSIDER THE SUPPLEMENTAL DECLARATIONS ..... 17

III.    THE HOD ERRED IN NOT AWARDING TF PRIVATE PLACEMENT .................... 18

    A.    The HOD Improperly Delegated the Determination of Private Placement to DCPS ............................................................................19

    B.    The Record Establishes TF Should Be Awarded Private Placement ...................20

        1.    TF's Disability Warrants Private Placement ................................ 21

        2.    TF's Specialized Education Needs Support Private Placement ............... 21

        3.    Capabilities of a Private Institution Would Meet TF's Specialized Educational Needs ........................................................... 24

        4.    Least Restrictive Environment Analysis Supports Private Placement ..... 25

    C.    The Court Should Decide the Issue of Private Placement ...................28

IV.    THE HOD ERRED IN DETERMINING THE COMPENSATORY EDUCATION OWED TO TF.................................................................................. 28

    A.    The HOD Does Not Adequately Support its Compensatory Education Determination ...........................................................................29

    B.    The Court Should Order Dr. Kogon's Expert Compensatory Education Recommendation ......................................................................32

    C.    TF Must Be Permitted to Use His Compensatory Education Through Age 25...........................................................................................34

V.    THE HOD ERRED IN DENYING TF ESY SERVICES ............................... 35

VI.    THE HOD ERRED IN UPHOLDING THE IEPS' TRANSITION SERVICES PLANS.......................................................................................... 38

CONCLUSION................................................................................................... 41

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Annette K. v. Hawaii,*
2013 WL 1213118 (D. Haw. Mar. 22, 2013) .......................................................................37

*Anthony v. District of Columbia,*
463 F. Supp. 2d 37 (D.D.C. 2006) .......................................................................................34

\* *B.D. v. District of Columbia,*
817 F.3d 792 (D.C. Cir. 2016) ..........................................................................19, 31, 32

\* *Branham v. District of Columbia,*
427 F.3d 7 (D.C. Cir. 2005) ...............................................................................20, 24, 28

*Carrie I. v. Dep't of Educ.,*
869 F. Supp. 2d 1225 (D. Haw. 2012) .................................................................................38

*B.D. ex rel. Davis v. District of Columbia,*
548 F. Supp. 3d 222 (D.D.C. 2020) .....................................................................................41

\* *District of Columbia International Charter School v. Lemus,*
660 F. Supp. 3d 1 (D.D.C. 2023) .......................................................................19, 30, 31

*Dixon v. District of Columbia,*
83 F. Supp. 3d 223 (D.D.C. 2015) .......................................................................................17

*Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt,*
583 F. Supp. 2d 169 (D.D.C. 2008) .....................................................................................32

*Fullmore v. District of Columbia,*
40 F. Supp. 3d 174 (D.D.C. 2014) .......................................................................................17

*Johnson v. District of Columbia,*
873 F. Supp. 2d 382 (D.D.C. 2012) .................................................................................35, 37

*Leggett v. District of Columbia,*
793 F.3d 59 (D.C. Cir. 2015) ..............................................................................................25

*McKenzie v. Smith,*
771 F.2d 1527 (D.C. Cir. 1985) ..........................................................................................20

*N.G. v. District of Columbia,*
556 F. Supp. 2d 11 (D.D.C. 2008) .................................................................................22, 27, 41

*Patterson v. District of Columbia*,
   965 F. Supp. 2d 126 (D.D.C. 2013) ........................................................38

*Perkiomen Valley Sch. Dist. v. R.B.*,
   533 F. Supp. 3d 233 (E.D. Pa. 2021) ....................................................38

*Pihl v. Mass. Dep't of Educ.*,
   9 F.3d 184 (1st Cir. 1993) ............................................................34, 35

*Q.C-C. v. District of Columbia*,
   164 F. Supp. 3d 35 (D.D.C. 2016) ........................................................26

\* *Reid ex rel. Reid v. District of Columbia*,
   401 F.3d 516 (D.C. Cir. 2005) ........................................................ *passim*

*D.R. ex rel. Robinson v. District of Columbia*,
   637 F. Supp. 2d 11 (D.D.C. 2009) ........................................................16

*S.H. v. Plano Indep. Sch. Dist.*,
   487 F. App'x 850 (5th Cir. 2012) ........................................................36

*Wade v. District of Columbia*,
   322 F. Supp. 3d 123 (D.D.C. 2018) ................................................17, 31

**Statutes**

Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482 ...........................................1

20 U.S.C. § 1400..............................................................................2, 20, 34

20 U.S.C. § 1412..................................................................................34

20 U.S.C. § 1414..............................................................................19, 38

20 U.S.C. § 1415........................................................................16, 18, 19, 34

Plaintiff TF, by his guardian Lisa Ellern-Feldman, respectfully submits this memorandum of law together with the accompanying declaration of Lisa Ellern-Feldman, dated May 16, 2024 ("Feldman Declaration"), with attached exhibit, the declaration of Miranda Kogon, dated May 16, 2024 ("Kogon Declaration"), and Plaintiff's statement of material facts, in support of his motion for summary judgment against Defendant District of Columbia (the "District") in this action pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §§ 1400-1482.[1]

## PRELIMINARY STATEMENT

This is an appeal of an administrative decision under the IDEA where the Hearing Officer Decision ("HOD") largely agreed that District of Columbia Public Schools ("DCPS") had denied TF a free appropriate public education ("FAPE") during the 2021-2022 and 2022-2023 school years, but failed to remedy the recognized harm. The HOD specifically found that TF's Individualized Education Plans ("IEP") for those two years were not reasonably calculated to enable TF to make appropriate progress in the areas of math, reading, adaptive/daily living skills, and speech and language. In addition, DCPS failed to provide TF the assistive technology ("AT") that he needed to communicate and to access the curriculum. Despite finding these egregious and pervasive violations of TF's rights, the HOD's remedy was to provide only 100 hours of tutoring and 25 hours of speech therapy, an award that is grossly inadequate to remedy the acknowledged two-year denial of FAPE in core academic subjects. Without robust, individualized relief, TF will not receive the assistance that he needs and to which he is entitled under law, so that he may have

---

[1] Unless otherwise noted, all alterations and emphases are added and citations and quotations are omitted. The Administrative Record ("AR") was filed with the Court at ECF No. 29-1, 29-2, and 29-3. Pages 1 to 480 of the administrative are found in ECF No. 29-1, pages 481 to 1674 are in ECF No. 29-2, and pages 1675 to 2644 are in ECF No. 29-3. Exhibit 1 is attached to the Declaration of Lisa Ellern-Feldman.

the "equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities" that is the United States' "national policy." 20 U.S.C. § 1400(c)(1).

TF is a 20-year-old student with severe autism spectrum disorder ("ASD") who performs academically at a mostly kindergarten level. TF reads on a pre-K/kindergarten level, and is below a first-grade level in math. At 20, TF cannot count money or make change, cannot follow traffic signals and safety signs, and cannot express himself clearly through speech.

For the 2021-2022 and 2022-2023 school years, DCPS failed to provide TF with appropriate specialized instruction and related educational services sufficient to enable him to make appropriate educational progress. Over that time period, DCPS denied services TF desperately needs, such as the assistive technology that he needs to communicate and to access the curriculum given his significant delays in speech and communication, and extended school year services, which would avoid the learning loss that results from a gap in instruction over the summer. TF has made little to no progress academically in the DC public school system. There is no meaningful evidence that DCPS can provide TF the education to which he he is entitled under the IDEA. Indeed, the HOD found that TF's specialized education instructor admitted that there was nothing more DCPS could do for TF.

However, progress is possible. Expert witnesses testified that TF has the capacity to make meaningful improvements in speech, reading, and critical adaptive/daily living skills like self-advocacy and safety that would make a real difference in his life. The key to that progress is for TF to receive sufficient compensatory education to account for the denial of FAPE and to be placed in a school that could accommodate his individualized educational needs going forward. To that end, TF's expert witness in compensatory education recommended and TF sought, among other

things, (i) private placement for TF at Kennedy Krieger Institute or a similar private school; (ii) that TF be found eligible to and permitted to use his compensatory education through age 25; (iii) that TF be awarded 400 hours of academic tutoring, 108 hours of speech therapy, and 150 hours of vocational therapy; and (iv) that TF receive extended school year services ("ESY").

Despite finding DCPS had denied TF a FAPE over two successive school years, the HOD only awarded a small subset of the relief sought by TF—125 total hours of tutoring and speech therapy—and outsourced the decision regarding private placement to a subsequent IEP/placement meeting with the Office of the State Superintendent of Education ("OSSE") and the DCPS IEP team. Predictably, this meeting did not result in any change in TF's placement because DCPS had no incentive to agree to private placement and thus did not reverse its steadfast opposition to moving TF to private school.

The HOD's denial of any effective remedy to TF withers upon scrutiny.

### ***Private Placement***

On private placement, the Court must reverse the HOD because the Hearing Officer impermissibly delegated his authority to DCPS. Binding precedent from this Court makes clear that allowing the local education authority to determine the relief a student will receive in connection with a due process hearing is legally impermissible. Moreover, the HOD should have awarded TF placement to a private school because the record shows that public school is not the proper placement for TF. Among other things, TF requires constant redirection and one-on-one support that he is not receiving currently and cannot receive in public school; he requires specialized services like applied behavior analysis ("ABA") therapy to augment the curriculum which his public school is unable to provide; and he requires a placement where staff can devote the necessary time and resources to improving his speech and communication skills, including

through the time-intensive use of assistive technology. These are some of the reasons why TF's specialized education instructor stated that there was nothing more that could be done for him at his current public placement. Moreover, private placement is appropriate since DCPS cannot demonstrate any progress over at least the past two years.

### *Compensatory Education*

The HOD's compensatory education determination is plainly deficient and also must be reversed. The HOD failed to engage in the individualized inquiry required by this Court and thus the HOD is entitled to little, if any, deference. The HOD sought to reduce the amount of compensatory education because TF did not prevail on all of his claims, but provided no rationale for drastically reducing the amount of general academic tutoring or speech therapy requested by TF's expert. Here, where the HOD found that there was a denial of a FAPE across two full school years in core academic curriculum and the provision of assistive technology, 100 hours of general tutoring and 25 hours of speech therapy is plainly insufficient and will not place TF in the position he would have been but for the denial of FAPE.

The HOD further compounded this error by failing to permit TF to use his compensatory education and other benefits until age 25. Given TF's age, he needs this time to make up for the years in which he was wrongly denied an education. Without the three-year extension, TF will not be fully able to benefit from the relief he is entitled to by law and will in effect lose his right to a FAPE. DCPS should not be allowed to run out the clock on his eligibility.

### *ESY Services*

The HOD must be reversed in denying TF ESY services because the HOD applied the wrong legal standard and, in any event, the record demonstrates that TF is entitled to ESY services. The record shows that TF has demonstrated regression that has jeopardized his ability to make

meaningful progress.  Moreover, in the years prior to 2021, TF received ESY services, and at the meeting ordered by the HOD, OSSE admitted that TF should be receiving ESY services.

### *Transition Services*

The HOD erred by not finding TF was denied a FAPE from the deficient transition services on the 2022 and 2023 IEPs.  Here, the HOD failed to apply the statutory standard to determine the sufficiency of the transition services.  If the transition services goals and accompanying services, including courses of study, are evaluated under the standard articulated by the IDEA, those portions of the IEPs are plainly insufficient and are yet another basis on which TF was denied a FAPE.  DCPS's failure to provide TF with a FAPE prevented him from having the skill level necessary to benefit from the transition services programs that his current placement can offer.  Accordingly, the HOD should be reversed to find a denial of FAPE with respect to transition services and TF should be awarded compensatory education in the form of vocational training.

For the reasons set forth below, the Court should grant TF's motion for summary judgment and reverse the HOD.

## STATEMENT OF FACTS

### A.    **TF Requires Specialized Education Support**

TF is a 20-year-old student who attends Roosevelt High School ("Roosevelt"), a public high school located in the District of Columbia.  AR at 388.  At the age of two, TF displayed speech and social development delays and was diagnosed with autism spectrum disorder ("ASD").  AR at 97.  A February 7, 2023 DCPS "Psychological Triennial Evaluation" confirmed this diagnosis and found that TF presented with ASD.  AR at 156, 163-64.

In 2008, DCPS deemed TF eligible for special education services under the disability category of autism (and later ASD).  AR at 6, 177, 503.  Since 2008, TF has undergone many

evaluations and assessments which repeatedly and consistently document TF's significant difficulty with expressive and receptive speech, among other areas.  AR at 2022-30.

In March 2020, when he was 16 years old, TF underwent an educational evaluation by DCPS.  AR at 2023-24.  The DCPS evaluation showed that in mathematics, TF continued to show very little progress.  TF was able to count only to 12 and write numbers only to 14, which were considered his "[s]trengths."  AR at 2024.  TF was on a pre-K to kindergarten level in math.  With respect to reading, TF had little or no reading ability.  *Id*.  The same evaluation showed that, as of March 2020, TF was able to "state and write his first and last name" and could "recite certain letters of the alphabet."  *Id.*

In 2021, when TF was approximately 17 years old, TF's mother abandoned him at a local hospital.  AR at 97, 2453-54.  In August 2021, TF was placed in the care of the District of Columbia Department of Child and Family Services and has resided in a group home since then.  AR at 97, 100-101.  On November 1, 2021, pursuant to a District of Columbia Superior Court order, TF underwent a psychiatric evaluation by the District of Columbia Department of Behavioral Health (the "DCBH").  AR at 96.  The 2021 DCBH psychiatric evaluation noted that TF "requires maximum support within the classroom and constant redirection to task."  AR at 98.  The DCBH psychiatric evaluation report concluded that improving TF's expressive language skills was "paramount to increase [TF's] functioning."  AR at 102 (alteration added).  In addition to his in-school speech services, DCBH recommended that TF receive additional outpatient speech services two times each week.  AR at 102.  The evaluation also recommended that TF receive vocational skills training and supportive and supervised employment training.  AR at 102.

In February 2023, speech pathologist Aswathy Thomas conducted a speech evaluation of TF, issuing a report on March 13, 2023.  AR at 177.  The "Functional Communication Profile -

Revised" section of the report described TF as having "**severe** deficits in receptive, expressive and social language skills." AR at 182. The report described TF's intelligibility level as "poor" regarding "sentence level during conversational speech." AR at 179. On the "Expressive One-Word Picture Vocabulary Test" and "Receptive One-Word Picture Vocabulary Test," the examiner found that TF "scored **severely below average**." (emphasis in original). AR at 181-82. Despite these findings, TF's speech services were not increased and remain below the level of services he was receiving in 2011. Mr. Thomas found that TF continued to present with communication deficits. AR at 183.

On March 24, 2023, Lisa Ellern-Feldman was appointed as TF's guardian. AR at 2453. Following her appointment as guardian, Ms. Ellern-Feldman challenged the IEPs that were in place for TF. AR at 2468-69.

B.    **The 2022 and 2023 IEPs Were Deficient**

The HOD found that the two IEPs at issue, the March 9, 2022 IEP and May 3, 2023 IEP, denied TF a FAPE in the following ways: "failure to evaluate appropriately, and failure to provide Student appropriate IEPs because the IEPs were not reasonably calculated to enable Student to make appropriate progress in the areas of math, reading, adaptive/daily living skills, and speech and language. In addition, the IEPs were deficient because they did not provide Student AT." AR at 43.

1.    The March 9, 2022 IEP

The first of two IEPs contested by TF in the underlying action was issued on March 9, 2022 (the "2022 IEP"), when TF was 18 years old. AR at 123. The 2022 IEP provided for 20 hours of specialized instruction per week in the self-contained classroom. AR at 132. In the areas of math, reading, and adaptive/daily living skills, the 2022 IEP provided that TF "requires maximum

support from [his] teacher, guided and clear instructions, i.e., modeling and practice while performing his individualized lessons for success." AR at 129 (alteration added). The IEP also notes that TF "demonstrates difficulties attending to task." AR at 129.

In the area of communication/speech and language, the 2022 IEP noted that TF's "communication deficits impact his ability to understand, learn and use new concepts, answer questions and communicate needs, wants and ideas using sentences with his peers and teachers." AR at 130. The IEP further stated that TF's "speech is difficult to understand due to many inconsistent sound deletions, substitutions of sounds in words. . ." AR at 130. The annual goal listed for communication/speech and language stated, "[a]fter listening to a speaker's presentation on a grade-level topic and given a model and pictures or photos related to a topic, [TF] will demonstrate an understanding of the topic by verbally responding to at least (2) on-topic questions in (3 out of 5) opportunities." AR at 130 (alteration added).

For the area of academic-mathematics, under the field of present level performance, the 2022 IEP stated that TF's "disability impacts his ability to access the general education curriculum because he easily gets distracted and needs constant redirecting, prompting, guided clear directions, and some one-on-one supports in order to be successful." AR at 126. The baseline field stated that TF "has demonstrated the inabily [sic] to add single digits numbers with assistance." AR at 126. The annual goals provided for mathematics were first, that "[b]y the end of the IEP year with the use of manipulatives, modeling, and guided instructions, [TF] will demonstrate the ability to add single digits numbers without regrouping for 75% accuracy in 3/4 opportunities[,]" and second, that "[b]y the end of the IEP year with prompting, assistance, and guided instructions, [TF] will be able to independently count up to 25 in sequence with 80% accuracy, in (4) out of (5) opportunities." AR at 126 (alterations added).

For the area of academic-reading, in the present levels field, TF was reported to be at a kindergarten level for reading comprehension, a pre-primer level for word recognition, and a kindergarten level for spelling. AR at 127.  Of two annual goals listed for reading, one only described listening, not reading: "By the end of the I.E.P. year with clear and guided directives, [TF] will be ale [sic] to listen to various reading materials and answer basic "wh" questions pertaining to the reading materials just heard in (3) out of (4) opportunities for 75% accuracy." AR at 128 (alteration added).  The second annual goal stated, "[b]y the end of the I.E.P period with manipulatives, promptings, and visual aids, [TF] will demonstrate the ability to identify the letters of the alphabet up to letter (L) in (3) out of (4) trails [sic] for 75% accuracy." *Id.* (alterations added).

The area of adaptive/daily living skills provided goals only regarding street signs. The baseline field stated that TF "has demonstrated the inability to identify safety signs in 4/5 situations for 80% accuracy" and the stated annual goal is that "[b]y the end of the IEP year, with guided clear instructions and prompts, [TF] will demonstrate the ability to identify safety signs in 4/5 situations for 80% accuracy."  AR at 129 (alterations added).

The 2022 IEP noted that TF did not require ESY services, even though TF received ESY services previously from DCPS in his 2019 and 2020 IEPs.  AR at 135.  As for a post-secondary transition plan, the 2022 IEP stated as a goal that upon graduation from high school, TF "will attend a training program to become a Maintenance Helper" and by the end of the IEP year, "will explore requirements for two (2) vocational training programs that will assist him in becoming a Maintenance Helper for 100% accuracy." AR at 137.

2.    The May 3, 2023 IEP

TF's IEP team met for TF's IEP Annual Review Meeting on March 3, 2023, when TF was 19 years old.  AR at 170, 214.  The first IEP on the record in this case for 2023 is an amended IEP

dated April 26, 2023, which notes the IEP was amended to address transition services: "Under the Transition Services section the following will be changed. Education and Training will be changed from Access to computer and internet with teacher supports to Vocational Training. Under the Employment Service section, it will be changed from Special Education Teacher(S) & Support Staff to Career Counseling. Under the Independent Living Services Section, it will be changed from Independent Living Skills Services & Instruction to Training on Independent living skills." AR at 211.  The April 26, 2023 IEP was then amended on May 3, 2023.  Under the heading Amendment Details, the May 3, 2023 IEP stated, "I am making changes to the Transition Services to meet the OSSE transition requirements."  AR at 214.

The May 3, 2023 amended IEP (the "2023 IEP") expressly notes that TF "wishes he could do better [in] reading, writing, telling time, numbers, and the use of money."  AR at 227 (alteration added).  Under "Post-Secondary Goals," the 2023 IEP notes that TF "will attend a training program to become a Custodian" and by the end of the IEP year, TF "will explore requirements for two (2) vocational training programs that will assist him in becoming a Custodian for 100% accuracy." AR at 228.  The IEP provided for 20 hours per week of specialized instruction and stated that TF does not require the support of a dedicated aide.  AR at 223.  Despite this, the IEP recognized TF needed "maximum support from his teacher."  AR at 216.

In the area of communication/speech language, the fields for TF's current levels and how TF's disability affects his access to the curriculum were copied from the 2022 IEP.  The 2023 IEP again stated that TF "will be introduced to when and where questions as well," suggesting he was not "introduced" to them in the 2021-2022 school year, AR at 221, despite the requirements of the 2022 IEP.  AR at 221.  The baseline field stated that "[c]urrently, TF's case manager/social worker reports that he is not able to express himself when he encounters pain or is frustrated."  AR at 222.

The goal stated was that TF "will identify or label 10 functional vocabulary words (to express how someone is feeling) when presented with a structured or unstructured language activity with 70% accuracy given minimal verbal prompts/cues." *Id*.  The 2023 IEP provided that TF will receive 90 minutes per month of speech-language pathology services.  AR at 223.

In the area of academic-mathematics, the goals provided in the 2023 IEP are identical to those in the 2022 IEP, with the exception that in the second goal, TF is asked to count to 35 instead of 25.  AR at 217.  In the area of academic-reading, the baseline field stated that TF is at a pre-K level for comprehension of short passages, a primer level for word recognition, and a kindergarten level for spelling.  AR at 218.  The stated goals for reading are contradictory.  The first goal was that "[b]y the end of the IEP year, with assistance and guidance, when given varied types of text(s) to read, [TF] will identify the main character and setting for 4 out of 5) [sic] opportunities for 80% accuracy."  AR at 219-20 (alterations added).  Yet the second goal was much more basic, suggesting two different levels of reading skill for one student: "[b]y the end of the I.E.P. period with manipulatives, prompting, and visual aids, [TF] will demonstrate the ability to identify the letters of the alphabet up to letter (O) in (3) out of (4) trails [sic] for 75% accuracy."  AR at 219-20 (alterations added).  In the area of adaptive/daily living skills, the goals again only focus on recognizing street signs, and indicate minimal progress was made from the previous IEP year. The stated goal is to "identify (5) safety signs in 4/5 situations for 80% accuracy," which contradicts the baseline provided, which states TF "will identy [sic] (5) [safety signs] for 80% accuracy."  AR at 221.

The IEPs at issue together demonstrate academic regression by TF: from the 2022 IEP to the 2023 IEP, TF regressed from kindergarten level to a pre-kindergarten level in reading comprehension of short passages and demonstrated stagnation in spelling.  AR at 127, 218.

### C.    TF's Public Placement Environment Is Inadequate

TF is currently in a self-contained Communication and Education Support ("CES") classroom at Roosevelt.  AR at 2562.  The Roosevelt CES classroom has students at different grade levels and abilities.  AR at 2564.  The ratio of students to teachers is approximately 8:2 in such classrooms.  AR at 2563.  In the Roosevelt CES, TF does not have a dedicated aide, AR at 223, but needs one-on-one support and constant redirecting.  AR at 216.  The CES classroom provides students with tablets to use during lessons, but most of the programs provided on those tablets require a reading level higher than TF's to be useful.  AR at 2528.

The CES students do not spend the entire school day receiving specialized instruction, AR at 2529, 2551, but TF has not benefitted academically or in his communication skills from time spent with non-disabled peers during the lunch period and special classes including gym, music, and art.  AR at 2297-99, 2366-67.  The CES students participate in the operation of the school coffee cart.  AR at 2524-25.  TF is able to follow instructions to make drinks and can hand customers change another participant has counted, but cannot make change or count money himself.  AR at 2537-38.

As part of the transition services provided by Roosevelt, TF was placed in a summer program for 2023 that was entirely virtual.  AR at 2456-57.  Due to his disability TF cannot successfully engage in online learning.  *Id.*  TF also cannot navigate the internet or other computer functions by himself.  AR at 2550.

TF currently receives specialized instruction outside the general education classroom setting for only 20 hours per week and receives 90 minutes per month of speech/language services.  AR at 223.  TF currently receives no occupational therapy services. AR at 2446.  By contrast, in 2011, TF received 25.5 hours per week of specialized instruction, one hour per week of

speech/language services, and 30 minutes per week of occupational therapy. AR at 511-12. Thus, despite TF showing no signs of educational improvement between 2011 and 2022, under the 2022 and 2023 IEPs he now receives 5.5 hours _less_ of specialized instruction each week than he did in 2011. AR at 223. And despite TF's severe impairments with expressive language, he also receives 2.5 hours _less_ of speech/language services each month than he did in 2011. AR at 223, 511-12.

TF's special education instructor, Dr. Shelley Hawkins, even told TF's guardian Lisa Ellern-Feldman that there was nothing more the public school could provide TF to help him. AR at 2469. Specifically, Dr. Hawkins said, "**there's nothing more for [TF] to do at Roosevelt High School, he's done it all.**" AR at 2469. The HOD credited this testimony from Ms. Ellern-Feldman. AR at 37.

### D.    TF Files Administrative Complaint Challenging His Deficient IEPs

On or about May 24, 2023, because DCPS had failed to provide services that would have enabled TF to make appropriate educational progress and thus denied him a FAPE, TF, through his guardian, filed an Administrative Complaint. In the Administrative Complaint, TF sought, among other things, (1) private educational placement, such as Kennedy Krieger or another equivalent appropriate private placement, through at least age 25; (2) an order that any IEP and placement include appropriate related services, including but not limited to, speech and occupational therapy services, as well as ESY services; (3) an order that TF's eligibility under the IDEA be extended through at least age 25 and that any compensatory education that TF receives be used through age 25; (4) an order that DCPS authorize funding for independent evaluations of TF, including but not limited to a vocational evaluation, psychoeducational evaluation, speech language evaluation, assistive technology evaluation, and occupational therapy evaluation; and (5)

an award of compensatory education, including tutoring, counseling, and transition/vocational support services.  AR at 287-88.

The Due Process Hearing was held on August 2, 3, 4, and 7, 2023.  AR at 8.  During the four-day hearing, the Hearing Officer heard testimony of various experts including TF's experts Dr. Miranda Kogon (an educational and compensatory education expert and former manager and director of special education at a DCPS public school from 2016-2020) and Jill Silverman (an expert in speech and language pathology with more than 20 years of experience).  AR at 8, 2282-83, 2424.  Dr. Kogon testified to the deficits in the 2022 and 2023 IEPs and the level of services TF now needs to make meaningful progress, as reflected in the compensatory education report.  AR at 389-94.  TF also presented evidence from Roberto Cruz (TF's social worker, who was qualified as an expert in social work) and Lisa Ellern-Feldman.  AR at 2332, 2253.  Both of these witnesses testified that that they had been told by employees of DCPS that TF could not make any more progress in his current placement.  AR at 2340-45, 2469.

DCPS offered the testimony of Andrea Roberson (school psychologist), Africa Battle, (transition services coordinator), and Dr. Sabrina Brown (special education director).  AR at 8, 2481, 2516.  DCPS did not call as a witness anyone who taught TF during the period in question, anyone who formally evaluated TF, or anyone who interpreted the data from TF's evaluations.  Also, although TF presented a speech expert, DCPS did not offer a speech expert.  Furthermore, DCPS did not offer testimony by an expert to challenge the compensatory education recommendations made by Dr. Kogon.

E.     **The HOD Confirmed that DCPS Had Failed to Provide a FAPE But Did Not Order Meaningful Relief**

The HOD was issued on September 1, 2023.  AR at 4.  The HOD found that the March 9, 2022 IEP and May 3, 2023 IEP were not reasonably calculated to enable TF to make progress

appropriately in light of his circumstances.  AR at 32-34.  The HOD found that the IEPs, failed to provide TF with a FAPE in numerous areas including math, reading, adaptive daily living skills, and speech and language.  AR at 32-34, 43.  The HOD also found that DCPS failed to provide TF with a FAPE because the IEPs did not provide TF with assistive technology.  AR at 43.

Despite the HOD finding that TF was denied a FAPE during two successive school years, and despite the fact that Dr. Kogon's compensatory education recommendations went unchallenged at the hearing, the HOD ordered only 100 hours of tutoring and 25 hours of speech therapy.  AR at 44.  This award was less than less than 25 percent of the compensatory education services TF requested, which included 400 hours of academic tutoring, 108 hours of speech therapy, and 150 hours of vocational support.  AR at 391-93.  Dr. Kogon also recommended that compensatory education be utilized until TF turned 25, but the HOD denied that relief as well.  AR at 43-44.  The HOD's rationale for ordering only 125 hours of support was that TF had not prevailed on _all_ claims while ignoring, for example, that a failure to prevail on claims related to transition services has no bearing on how much academic tutoring and speech therapy TF may need.  The HOD also failed to account for the fact that DCPS did not specifically challenge the compensatory education calculation made by Dr. Kogon.  AR at 43-44.

The HOD failed to rule on whether private placement for TF was necessary and deferred that decision to DCPS.  AR at 38.  The HOD directed a meeting to be attended by DCPS, TF's guardian, and a representative from the OSSE for DCPS to determine _if it would agree_ to private placement, AR at 44, Feldman Decl. ¶ 12, despite the fact that DCPS had been steadfastly opposed to private placement up to that point.   AR at 352-53.

On September 29, 2023, TF's guardian Lisa Ellern-Feldman, TF's attorney William Jaffe, TF's expert Dr. Kogon, the DCPS IEP team, and Katie Reda (placement manager) from OSSE

attended the mandated meeting (the "September 29 Meeting").  Feldman Decl. ¶ 8-10; Kogon Decl. ¶ 8; Ex. 1 pdf p. 2.  At the meeting, TF's guardian reiterated her request for private placement. Feldman Decl. ¶ 13; Ex. 1.  Ms. Reda explained that OSSE would make a _recommendation only_, which DCPS was free to accept or reject.  Feldman Decl. ¶ 20; Ex. 1 at pdf pp. 2, 6-7.  No matter what recommendation OSSE made, DCPS was free to adopt its original position, namely denying private placement, leaving TF in a no-win scenario.  Feldman Decl. ¶¶ 20-21, 24; Ex. 1 at pdf pp. 2, 6.  At the meeting, Ms. Reda did not recommend private placement and provided no rationale for her decision or explain what rubric she used to recommend a denial of private placement. Feldman Decl. ¶ 19; Ex. 1.  At the end of the September 29 Meeting, DCPS refused to agree to private placement, the predicted outcome given its longstanding objection to private placement. Feldman Decl. ¶¶ 21-23; Ex. 1.

Ms. Reda acknowledged at the meeting, however, that TF should receive ESY services. Feldman Decl. ¶ 17; _see_ Ex. 1 at p. 6.

On or about November 22, 2023, the instant action was commenced challenging those portions of the HOD that had been decided adversely to TF.

## ARGUMENT

### I.    SUMMARY JUDGMENT UNDER THE IDEA

In an action to review an IDEA administrative determination, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the [c]ourt may receive."  _D.R. ex rel. Robinson v. District of Columbia_, 637 F. Supp. 2d 11, 16 (D.D.C. 2009).  The court "shall receive the records of the administrative proceedings[,]" "shall hear additional evidence at the request of a party[,]" and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  A party challenging a hearing officer's determination

16

only has "the burden of persuading the court that the hearing officer was wrong." *Wade v. District of Columbia*, 322 F. Supp. 3d 123, 130 (D.D.C. 2018). Although "[t]he court gives 'due weight' to the [hearing officer's decision] and does not substitute its own view of sound educational policy for that of the hearing officer[,]" *Dixon v. District of Columbia*, 83 F. Supp. 3d 223, 230 (D.D.C. 2015), "without reasoned and specific findings[,]" "the Court affords less deference to [Hearing Officer Decisions] in the context of the IDEA than is conventional in administrative proceedings." *Wade*, 322 F. Supp. 3d at 130. A hearing officer decision without reasoned and specific findings should be reviewed under a "non-deferential standard." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005). Applying these well-established standards, it is clear that the portions of the HOD challenged herein must be reviewed under a "non-deferential standard" of review and should be reversed. *Id.*

## II.   THE COURT SHOULD CONSIDER THE SUPPLEMENTAL DECLARATIONS

In deciding the present motion, the Court should consider the supplemental declaration from TF's guardian, Lisa Ellern-Feldman and DCPS's notes from the September 29 Meeting, attached to the Feldman Declaration as Exhibit 1, and the declaration of TF's expert witness Dr. Miranda Kogon. All of the supplemental evidence details what occurred at the September 29 Meeting, which was improperly ordered by the HOD in lieu of a ruling on TF's entitlement to private placement (*see infra* at 19). This Court has recognized that supplemental evidence may be necessary to complete the record in cases where, as here, there were developments after an HOD was issued that bear on the student's claims. *Fullmore v. District of Columbia*, 40 F. Supp. 3d 174, 180 (D.D.C. 2014) ("The reasons for considering such supplemental evidence 'might include gaps in the administrative transcript owing to . . . an improper exclusion of evidence by the

administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing.'").

The HOD directed that the parties participate in a meeting regarding TF's private placement claim. AR at 44. The resulting September 29 Meeting between the parties, including Ms. Ellern-Feldman and Dr. Kogon, was not transcribed. What occurred during that meeting is relevant to, among other things, TF's claim for private placement, because DCPS refused TF's request for private placement, even though the HOD found denial of FAPE (AR at 43) and that Dr. Hawkins admitted there is nothing else TF can do at Roosevelt (AR at 2469). Furthermore, the September 29 Meeting is relevant because at the meeting, OSSE acknowledged that TF should be receiving ESY services (Feldman Decl. ¶ 17 & Ex. 1 at pdf p.6), which the HOD denied TF and which is an independent claim for relief sought here.

Because the information contained in the Feldman Declaration and Kogon Declaration is directly relevant to the issues in this case, it should be considered by the Court. *See* 20 U.S.C. § 1415(i)(2)(C)(ii) ("the court . . . shall hear additional evidence at the request of a party").

III.    **THE HOD ERRED IN NOT AWARDING TF PRIVATE PLACEMENT**

The HOD erred in failing to order private placement to remedy DCPS's repeated failure to provide TF a FAPE. Instead of ordering private placement, the HOD directed that the parties should participate in a meeting on the issue, requiring DCPS to consent to private placement notwithstanding the fact that DCPS consistently opposed such relief. AR at 37-38. The only way to remedy the pervasive FAPE violations committed by DCPS and ensure TF receives the education he is entitled to under the IDEA is to award private placement. Accordingly, this Court should reverse the HOD and award private placement.

A.    **The HOD Improperly Delegated the Determination of Private Placement to DCPS**

Instead of directly ruling on TF's request for private placement through age 25, the HOD ordered DCPS to "convene an IEP team/placement meeting with an appropriate OSSE representative to review [TF's] placement and consider whether [TF] needs a non-public placement." AR at 44. Under the IDEA, the Hearing Officer, not DCPS, is required to resolve the claims brought forth in a due process administrative complaint. The HOD's decision to delegate the decision on private placement is reversible error.

The IDEA requires a qualified hearing officer to preside over due process hearings and gives the hearing officer broad authority to award relief. *See B.D. v. District of Columbia*, 817 F.3d 792, 798 (D.C. Cir. 2016); 20 U.S.C. § 1415(i)(2)(C)(iii). "[A] hearing officer 'may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions.'" *Reid*, 401 F.3d at 526 (stating that court cannot "defer to the officer's decision to delegate authority to the IEP team"). Accordingly, IDEA due process hearings "may not be conducted by an employee of the State educational agency or the local educational agency involved in the education or care of the child." 20 U.S.C. § 1415(f)(3)(A)(i)(I). Thus, in *District of Columbia International Charter School v. Lemus*, 660 F. Supp. 3d 1, 29 (D.D.C. 2023), the district court reversed a hearing officer decision because the student's "IEP team, which is partially made up of DCI employees, cannot exercise the Hearing Officer's power to determine appropriate compensatory education," *Lemus*, 660 F. Supp. 3d. at 28. It was therefore impermissible in the present case that the meeting ordered by the HOD to determine whether TF should receive private placement involved members of the DCPS IEP team.[2]

---

[2]    An IEP team must include "a representative of the local education agency." 20 U.S.C. § 1414(d)(1)(B)(iv).

Ms. Reda made clear that DCPS was free to do what it wanted with regard to private placement regardless of any recommendation by OSSE. Feldman Decl. ¶ 20; Ex. 1 at pdf. pp. 2, 6-7. In order for TF to receive private placement as a result of this meeting, DCPS needed to voluntarily agree to TF's requested relief, despite the fact that it had steadfastly opposed, and continues to oppose, such relief. Ex. 1 at pdf. pp. 2, 6-7. Thus, the HOD gave DCPS itself the power to determine that private placement was not warranted, despite the HOD's finding that TF had been denied a FAPE. Accordingly, the HOD's decision regarding private placement must be reversed.

B.    **The Record Establishes TF Should Be Awarded Private Placement**

The record establishes that TF should be awarded private placement because that is the only way that DCPS can fulfill the IDEA's guarantee that TF will receive "special education and related services designed to meet [his] unique needs." 20 U.S.C. §1400(d)(1)(A).

The D.C. Circuit has identified a set of considerations relevant to determine whether a private school is appropriate, "including the nature and severity of the student's disability, the student's specialized educational needs, the link between those needs and the services offered by the private school, the placement's cost, and the extent to which the placement represents the least restrictive educational environment." *Branham v. District of Columbia*, 427 F.3d 7, 12 (D.C. Cir. 2005) ("To inform this individualized assessment, courts fashioning discretionary equitable relief under IDEA must consider all relevant factors.") (cleaned up); *see also McKenzie v. Smith*, 771 F.2d 1527, 1531, 1535-36 (D.C. Cir. 1985) (affirming district court's placement decision that took into consideration the student's "individual needs"). The HOD did not engage in the *Branham* analysis and certainly did not consider all relevant factors.

The Court should apply a "non-deferential standard" of review to the HOD because of these errors. *Reid*, 401 F.3d at 521. Once the relevant facts are considered, they overwhelmingly support a finding that private placement is the least restrictive environment for TF.

### 1.    TF's Disability Warrants Private Placement

First, the nature and severity of TF's disability strongly support an award of private placement. TF has severe autism spectrum disorder. AR at 163. TF presents with cognitive delays and is very limited in his present capability for speech and expression. AR at 164, 183, 339-40, 2361-62. He does not initiate conversation and responds to questions mainly in one-word answers (AR at 181); longer sentences are largely unintelligible to others (AR at 2299, 2305, 2457-58). He is unable to recognize many dangerous situations, like crossing the street against oncoming traffic, and is unable to parse social cues, reliably communicate when he is in pain, or otherwise self-advocate. AR at 114-120, 163, 2455, 2503. Academically, TF's cognitive delays mean that he does not and likely will not perform at or close to grade level. AR at 2487-88. The HOD does not purport to account for these impediments.

### 2.    TF's Specialized Education Needs Support Private Placement

TF has extensive specialized education needs. TF requires "direct one to one instruction" (AR at 207); TF needs one-on-one support for all lessons to model correct sound production (AR at 342), utilize assistive technology (AR at 2343), and keep him engaged (AR at 44-45); he requires ABA therapy to improve social skills, empathy, and engagement (AR at 2387, 2405-06); for academic subjects he requires an intervention program and dedicated instructor who will use a multi-sensory approach, like Orton-Gillingham in the case of writing and reading (AR at 391-92, 2402-03); he also requires dedicated vocational support to develop the skills he needs to be more independent (AR at 393, 2404). TF requires all instruction to be in-person. AR at 2456-57.

Additionally, he needs support and planned routes for any travel, like the bus home.  AR at 2458-59.

TF's specialized education needs can only be met in private placement, as recognized by DCPS's admission that Roosevelt "ha[d] nothing more to offer [TF]."  AR at 2469.; *see also N.G.*, 556 F. Supp. 2d at 37-38 (finding private placement appropriate where there is "no evidence N.G. would have received any of the accommodations suggested by Dr. Robbins had she returned to Wilson....").  More specifically, the record is clear that more individualized attention is an accommodation TF needs but that Roosevelt cannot provide.  *See* AR at 2366 (Kogon testifying based on IEPs that "Even within a self-contained classroom, with a small student to teacher ratio, he still needs these [sic] one to one support. And he's still not making progress."); AR at 2401. The limitations of the CES classroom model at Roosevelt disadvantage TF in multiple ways.  TF lacks a dedicated instructor despite needing "constant redirection to task," and cannot benefit from the technology because of his underdeveloped core academic skills.  DCPS's own witnesses acknowledged that the benefits of the tablet were meaningless to TF because, among other things, certain features, like access to "the entire DCPS library" or the game Kahoot, are not beneficial to a student that reads at a Pre-K level.  AR at 2528.

Assistive technology, which DCPS denied TF for years but which the HOD found TF is entitled to, AR at 35, is exactly that system designed to improve TF's ability to communicate and access the curriculum.  TF learning and using such a system will require more teacher interaction, not less.  That DCPS failed to obtain AT for TF despite having notice that TF previously received AT, and would benefit from it presently, shows that DCPS cannot meet his needs.

The HOD fails to consider TF's specialized education needs and discusses only the services Roosevelt *can* provide, but the HOD misconstrues the record.  The HOD relies heavily on

speculation about future possible opportunities and changes at Roosevelt, saying "expanded employment and transition opportunities" could be available to TF with a new DCPS administrator at Roosevelt (AR at 37-38).  But these speculative assertions do not justify denying TF private placement.  First and foremost, provision of employment and transition services, while a part of TF's overall education, does not excuse DCPS from providing TF a tailored education compliant with the IDEA in academic subjects such as math, reading, and spelling.  Testimony regarding expanded transition services that may become available does not show that DCPS can or will address the issues that resulted in a denial of a FAPE.

In any event, the transition services Roosevelt provides are a poor fit for TF as he lacks the basic underlying reading, math, and communication skills to meaningfully participate in and benefit from these supposed opportunities.  The HOD reliance on testimony from Dr. Sabrina Brown, Roosevelt's Director of Specialized Instruction, regarding new opportunities ignores that TF was rejected from the vocational program Dr. Brown was affiliated with, River Terrace, because he lacked the necessary communication skills.  AR at 2580.  Similarly, TF's school job at the coffee cart does not support the HOD's determination because DCPS's own witnesses acknowledged that TF does not possess the skills necessary to benefit as other students do or ever be hired at a coffee cart-type job after he graduates.  TF cannot read, count money, make change, converse with customers, or ask for help when he needs assistance. AR at 196, 2377, 2537-38, 2455. And the summer training program TF was set up with in 2023 (AR at 2554-55) was, as a practical matter, unavailable to TF because he could not navigate an online program, AR at 2543-44, 2456-57.

Thus the record clearly shows that TF has not benefitted -- and will not benefit -- from any of the supposed advantages of Roosevelt, and that DCPS cannot meet his specialized educational needs.

3.    Capabilities of a Private Institution Would Meet TF's Specialized Educational Needs

The HOD did not appropriately consider "the link between [TF's] needs and the services offered" by the private placement.  *Branham*, 426 F.3d at 12.  The HOD improperly excluded certain testimony regarding Kennedy Krieger, a proposed school for TF's private placement.  *See* AR at 2318-19 (HO Ruff sustaining objection to direct questions to Jill Silverman, speech and language expert, regarding Kennedy Krieger program).

In addition to improperly excluding relevant evidence, the HOD failed to engage in any analysis regarding the link between TF's specialized educational needs and the services offered by Kennedy Krieger or a similar private institution.  Therapies tailored to TF's disability, such as ABA therapy, are not available at Roosevelt as a direct service because Roosevelt does not have a qualified practitioner on staff.  AR at 2558.  Dr. Kogon testified that ABA therapy is necessary for TF in that it "target[s] adaptive living skills, executive functioning skills, [and] social skills, but it has a very specific support. It supports students who are very low verbal skills like [TF] himself, and it gives them tools to be able to successfully navigate and also the school setting."  AR at 2387.  Dr. Kogon testified that Kennedy Krieger's capabilities go far beyond that of Roosevelt or other public schools in understanding TF's disability and devising a support plan for TF:

> They understand how students learn in a way that most schools in the world don't.
> They work with neuropsychologists. They work with psychiatrists. They have a
> very complex MDT of professionals that really get to understand students in ways
> that schools really just aren't able to. Even with all of the resources that DCPS has,

they are not able to have an MDT that looks anything like a school like Kennedy Krieger. They have behavior specialists on the direct support team. They have BCBs on the team. And again, those psychologists, those psychiatrists, they provide intense supports and services at a higher dosage rate at a more individualized level than [TF's] able to receive in his current placements. They really do have dedicated and individual teams. And I have seen huge successes come out of Kennedy Krieger. And I really do believe that if [TF] was able to go there for until he's 25 . . . that he would be able to regain, gain a lot of those skills that we want him to have.

AR at 2408.  Dr. Kogon raised many of these points again during the September 29 Meeting with DCPS and OSSE.  *See* Kogon Decl.  ¶¶9-12.  The cost of Kennedy Krieger is appropriate for the services that it provides its student and are comparable to the cost of other private schools that serve students with special needs in the Washington, D.C. area.  *Id.* at 12.[3]

Given that DCPS lacks the credentialed staff to support TF and DCPS's own employees do not feel Roosevelt can do anything further for TF, the Court should direct DCPS work TF's guardian to identify and enroll him in an appropriate non-public school.

4.    Least Restrictive Environment Analysis Supports Private Placement

The HOD's private placement decision does not accord with the IDEA standard that "requires that a child be educated in the least restrictive environment possible—that is, the one that provides some educational benefit and most closely approximates the education a disabled child would receive if she had no disability." *Leggett v. District of Columbia*, 793 F.3d 59, 74 (D.C. Cir. 2015).  TF asserted that the IEPs should have prescribed that his least restrictive environment is non-public placement given that TF has received no educational benefit in the CES classroom at Roosevelt.  AR at 37.  However, the HOD erroneously concluded that "there is insufficient

---

[3]    TF did not have an acceptance from Kennedy Krieger because Kennedy Krieger required a certificate of referral from DCPS to enroll him in school.  AR 2408 (noting TF "would first jave to have the approval to get to the program"); Kogon Decl. ¶ 14.

[evidence] that [TF's] IEPs at issue are/were deficient because they did not prescribe an LRE [least restrictive environment] in a full-time non-public placement." *Id.*

The HOD's primary basis for concluding that Roosevelt was the least restrictive environment for TF was that TF has "made significant progress" at Roosevelt. AR at 37. This is belied by the record. In every academic area, the record shows that TF has made little to no progress, and in some areas has demonstrated regression. AR at 2374-77. Based on the inappropriate goals for adaptive/daily living skills in the two IEPs at issue, TF apparently spent a school year learning to recognize just one street sign. AR at 2381-82. Data from the IEPs and triennial evaluation indicate that TF cannot recognize all single digit numbers. AR at 2368. To the extent TF has made progress at his school during the period covered by the IEPs at issue, the record supports only a finding that he has made minor improvement in socialization skills. AR at 2340, 2491.

It is not disputed that TF is exposed more to nondisabled peers at Roosevelt than he would be at a private placement, but the HOD's almost exclusive focus on socialization is misplaced. Least restrictive environment concerns are of less importance than the IDEA's "**primary goal** of providing disabled students with an appropriate education," especially where it is the child's parent or guardian "who seek the more restrictive environment." *Q.C-C. v. District of Columbia*, 164 F. Supp. 3d 35, 55 (D.D.C. 2016) (awarding private placement to student). "[T]he least restrictive environment factor focuses on the needs of the student, and Congress recognized that regular classrooms simply would not be a suitable setting for the education of many handicapped children." *Id.* Here, the needs of TF strongly support awarding prospective private placement over prioritizing time spent with non-disabled peers.

The benefits of socialization for TF have been both generalized and overstated by the HOD and DCPS. Ms. Battle testified about the socialization of CES students with their non-disabled peers in extremely general terms, stating that socialization forms friendships, teaches non-disabled students to tolerate differences, and gives disabled students someone "to look up to." AR at 2526, 2529-30. None of her statements were specific to TF or demonstrated how TF's speech and social skills had actually improved during his time at Roosevelt. Dr. Brown's testimony that TF has become more social and comfortable over the time he has been at Roosevelt, while specific to TF, highlights first and foremost that TF feels comfortable with the people he sees and interacts with consistently—his teachers. But it is not evidence that Roosevelt is the appropriate placement for TF. Ms. Battle testified that post-matriculation, TF would do well in a job where he does not need to interact with other people. That TF should not have a job where he has to interact with others suggests a deficit in social skills that years of interacting with non-disabled peers under DCPS's instruction has not addressed. There is no evidence that socialization with non-disabled peers has improved TF's ability to communicate.

In addition, the HOD's decision "improperly shifted the burden of proof to [TF] to show that [Roosevelt] was inappropriate, rather than placing it on DCPS to show that [Roosevelt] was appropriate." *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 37 (D.D.C. 2008). Here, the HOD stated that the Hearing Officer "is not convinced that Student cannot be served appropriately at School A...." AR at 37-38. This statement in the HOD shows the HOD impermissibly switched the burden of proof onto TF to show that Roosevelt High School would be inappropriate in all circumstances, including when factoring in potential prospective changes to employment and transition opportunities. Accordingly, the Court should find that private placement is TF's least restrictive environment.

C.      **The Court Should Decide the Issue of Private Placement**

This Court should decide the issue of TF's entitlement to private placement instead of remanding the issue to the Hearing Officer.  This Court has the authority to make these findings and provide this remedy, without remand.  For example, in *Branham*, the D.C. Circuit encouraged the district court not to remand and instead to make its own findings as to whether private placement and remedial tutoring was an appropriate remedy, specifically because the case involved a 15-year-old student.  427 F.3d at 13.  "Although *Reid* permits the district court either to take supplemental evidence or to return the case to the hearing officer," the *Branham* court wrote, "in light of the educational harms Terrance has already suffered, we encourage the district court to undertake the evidentiary hearing itself in order to minimize the potential for further delay."  *Id.*

The facts here are even more persuasive than in *Branham*.  TF is 20 years old; the student in *Branham* was 5 years younger.  Here, additional administrative proceedings, likely followed by another judicial appeal, will delay TF's schooling and make any ultimate award of private schooling entirely or largely moot.  A remand will only reward DCPS's failure to provide TF with an appropriate public education by minimizing the amount of private education that TF will receive.  Further delay prevents TF from receiving the assistance that he needs to remedy the pervasive violations of his rights and to achieve the goals of the IDEA.

Thus, having this Court decide the issue of private placement now is the most expeditious approach to ensuring that TF can receive and benefit from the relief necessary to address DCPS's repeated denial of a FAPE.

IV.    **THE HOD ERRED IN DETERMINING THE COMPENSATORY EDUCATION OWED TO TF**

The HOD's award of a mere 125 hours of compensatory education, comprised of 100 hours of tutoring and 25 of speech therapy, is grossly inadequate given the determination that the IEPs

at issue deprived TF of a FAPE.  The HOD further compounded its error by denying TF the right to use his compensatory education through age 25, even though TF was already 19 at the time the HOD was issued.  The Court should vacate the HOD's compensatory education award and award the compensatory education recommended by Dr. Kogon, consisting of 400 hours of academic tutoring, 108 hours of speech services, and 150 hours of vocational support that TF would be permitted to use until age 25.  AR at 391-93.[4]

Again, the HOD must be reviewed under a "non-deferential" standard of review because the HOD failed to follow the Court's standard in *Reid* to craft an individualized award.  *Reid*, 401 F.3d at 521-22.

A.    **The HOD Does Not Adequately Support its Compensatory Education Determination**

The decision to award TF only 100 hours of academic tutoring and 25 hours of speech therapy is not supported by the record and must be overturned.  The purpose of compensatory education is to "replace[] . . . educational services the child should have received in the first place." *Reid*, 401 F.3d at 518 (compensatory education is an award of services "to be provided prospectively to compensate for a past deficient program.").  Here, the HOD concluded that TF was denied a FAPE during two school years across the entire range of school curriculum as well as not receiving the necessary communicative supports.  In light of these pervasive violations, 125 hours of compensatory education is not "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid*, 401 F.3d at 524.

---

[4]    As explained below, the HOD erroneously found that IEP did not deny TF a FAPE with respect to transition services.  As set out below in Section VI (*infra* pp. 39-42), TF requests that the HOD's conclusion on transition services be reversed and that he be awarded 150 hours of vocational support.

This Court mandates that a compensatory education award must "rely on individualized assessments" after a "fact-specific inquiry." *Reid*, 401 F.3d at 524; *see Lemus*, 660 F. Supp. 3d 1, 28 (reversing compensatory education award that "was not supported by an individualized assessment or facts"). The HOD's grant of compensatory education was not the result of a fact-specific inquiry. The HOD found that TF was denied a FAPE in the following ways: "failure to evaluate appropriately, and failure to provide Student appropriate IEPs because the IEPs were not reasonably calculated to enable Student to make appropriate progress in the areas of math, reading, adaptive/daily living skills, and speech and language. In addition, the IEPs were deficient because they did not provide Student AT." AR at 43. However, the HOD does not explain how the compensatory education remedy ordered is appropriate for the injury sustained by TF as a denial of FAPE.

To the extent the HOD based its compensatory education award on the fact that the TF did not prevail on all of his claims, the HOD failed to engage in the individualized factual inquiry required by *Reid*. The HOD did not consider factors such as the length of time TF was denied a FAPE, what services TF was denied, and what progress TF could have made had he not been denied a FAPE for two years. *See, e.g., Reid*, 401 F.3d at 524. The HOD seems to have treated compensatory education almost like an attorney's fee award to a prevailing plaintiff, haircutting the award because TF prevailed only in part of his claims. AR at 43-44. Pointedly, the HOD did not specify which services (if any) would be required only for the rejected claims.

Indeed, there is nothing in law or logic that supports the conclusion that a failure to prevail on a claim related to transition services should result in a decrease of the amount compensatory education for the denial of FAPE in reading, math, speech, and language. The HOD provided

"neither reasoning to support" his determination "nor factual findings showing that [the result] satisfied" TF's needs. *Reid*, 401 F.3d at 521.

The flaws in the HOD's analysis of compensatory education is quickly confirmed by simple math. The HOD award was 25 hours of speech therapy for two years of denial of a FAPE (AR at 44) -- that is equivalent to approximately one hour per month for two years. One hour per month is **less** than the 90 minutes per month provided to TF under the 2022 and 2023 IEPs that the HOD found deficient. The award for denial of FAPE in math and reading is similarly paltry. The HOD determined TF would receive a total of 100 hours of independent tutoring in math and reading (AR at 44), which is just over half an hour per week, for each subject, for two years. TF purportedly received 20 hours per week of instruction in five subjects, AR at 132, which would mean the deficient IEPs provided TF two hours of math instruction per week and two hours of reading instruction per week. The HOD compensatory education award therefore equates to a quarter of the deficient instruction. No rationale is provided in the HOD explaining why these numbers would be sufficient to put TF in "the educational position he would have been but for the FAPE denial." *B.D.,* 817 F.3d at 799; *see Lemus*, 660 F. Supp. 3d at 28 (award of 100 hours of independent tutoring "was not supported by any individualized assessments or facts"); *Wade*, 322 F. Supp. 3d at 133 (compensatory education award of 50 hours insufficient where student was denied a FAPE across two school years).

The HOD's conclusory claim that "the services awarded...are calculated to provide the [student] educational benefits that likely would have accrued from special education services [DCPS] should have supplied in the first place" confirms that deference is not owed to the HOD. *See B.D.*, 817 F.3d at 798. In *B.D.*, the D.C. Circuit held that "the Hearing Offer had an obligation to either a fashion compensatory education program to redress that harm or provide an adequate

explanation for his decision not to do so." *Id.* at 799.  Deference was not owed to the HOD because the "Hearing Officer failed to address the broader question of how to put B.D. in the educational position he would be in but for the FAPE denial." *Id.*  The same is true here where the HOD did not purport to address these issues identified in *B.D.* and offers no explanation as to how 125 hours of compensatory education would put TF in the "educational position he would be in but for the FAPE denial." *Id.*

B.    **The Court Should Order Dr. Kogon's Expert Compensatory Education Recommendation**

The compensatory education recommendation by Dr. Kogon provides a comprehensive schedule of the services TF is entitled to based on DCPS's two-year denial of FAPE.  Given DCPS's repeated denial of FAPE here and the comprehensive analysis of the record by Dr. Kogon, and the absence of any counter explanation by DCPS as to the amount that should be due, the Court should adopt the compensatory education recommendation made by Dr. Kogon, which included, among other things, assistive technology, 400 hours of academic tutoring, 108 hours of speech therapy, and 150 hours of vocational support.[5]

The Court should adopt Dr. Kogon's recommendation because it provides an amount of services that would actually compensate for a two-year denial of FAPE, and was calculated to address TF's unique needs, as supported by the record.  *See Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt*, 583 F. Supp. 2d 169, 172 (D.D.C. 2008) ("To comply with the *Reid* standard, [the student] must propose a well-articulated plan that reflects his current educational abilities and needs and is supported by the record.").  Based upon her review of more than 2000

---

[5]    Dr. Kogon also recommended that TF receive private placement, which is addressed separate in Section III *supra* at pp. 25-26, and be able to use his compensatory education until age 25, which is addressed in Section IV.C *infra* at p. 35-36.

pages of TF's academic records, Dr. Kogon's report recommended, among others, the following services:

- 200 hours of reading tutoring, which is sufficient time to complete a research-based intervention program, like Orton-Gillingham or Lexia, which will "target and improve current deficits that [TF] has in phonemic awareness, phonics, fluency, vocabulary, and comprehension";

- 100 hours of writing expression tutoring, which is sufficient time to complete a research based intervention program that will "target and improve current deficits that [TF] has in phonological awareness, word recognition/decoding, writing process, writing product, vocabulary knowledge, and spelling"; and

- 100 hours of math tutoring, which is sufficient time to complete a research-based intervention program that will "target and improve current deficits that [TF] has in counting, addition, and subtraction concepts, simple fractions, mixed numbers, and everyday math skills that he will need to prepare him to be career ready."

- 108 hours of speech and language services "so that [TF] can improve his speech sound production, expressive language, and receptive language."

AR at 391-92.

As the HOD itself states, "To aid the court or hearing officer's fact-specific inquiry, 'the parties must have some opportunity to present evidence regarding [the student's] specific educational deficits resulting from his loss of FAPE and the specific compensatory measures needed to best correct those deficits.'" AR at 43 (HOD quoting *Reid,* 401 F.3d at 526).  Dr. Kogon's expert report, based on a thorough review of TF's educational records, provides such "specific compensatory measures."  DCPS presented no evidence to undermine the specifics of

Dr. Kogon's compensatory education recommendation, and therefore the Court should award the compensatory education recommended by Dr. Kogon.

     C.     **TF Must Be Permitted to Use His Compensatory Education Through Age 25**

The HOD's statement that "there is not sufficient evidence on the record" to award compensatory education through age 25 is belied by the record. Currently, TF is scheduled to receive his high school certificate at age 22, in just two years. At that time, DCPS will have no responsibility for TF, despite the fact that it denied him a FAPE for both the 2021-2022 and 2022-2023 school years. Given TF's advanced age and the repeated failings of DCPS to properly educate him, it is only appropriate that TF be given sufficient time to use the compensatory education. *See Pihl v. Mass. Dep't of Educ.*, 9 F.3d 184, 189 (1st Cir. 1993) (recognizing that courts can award of compensatory education to a student beyond the age of 21 because the student "is asking only that the court compensate him for rights that he claims the school district denied him in the past"); *Anthony v. District of Columbia*, 463 F. Supp. 2d 37, 44 n.6 (D.D.C. 2006) ("Federal courts have consistently held, however, that compensatory education may continue beyond that age [21] to make up for the denial of FAPE during the statutory period.").

Dr. Kogon recommended that TF be permitted to use his compensatory education through age 25, testifying that the additional years are necessary to compensate for the years DCPS denied TF a FAPE. AR at 2401. Dr. Kogon also expressly noted that TF "doesn't have the appropriate supports that are needed to help him be successful as a graduate." *Id.*

Failure to permit TF to use his compensatory education through age 25 would create perverse incentives for DCPS and is at odds with the IDEA's purpose. The IDEA requires DCPS to provide a "free appropriate education" to every disabled child, and empowers the courts to provide a remedy for those who are deprived of that right. 20 U.S.C. §§ 1400(c)(3), 1412(a)(1),

1415(i)(2)(A).  Moreover, the failure to provide compensatory education services to TF until the age of 25 would incentivize school districts to "stop providing required services to older teenagers, relying on the Act's time-consuming review process to protect them from further obligations." *Pihl*, 9 F.3d at 189.

## V.     THE HOD ERRED IN DENYING TF ESY SERVICES

The HOD's denial of ESY services must be reversed because the HOD applied the incorrect standard to evaluate regression and failed to credit record evidence demonstrating that without ESY services TF's regression substantially thwarted the goal of meaningful progress.  The failure to apply the correct standard requires the Court employ a "non-deferential" standard of review.  *Reid*, 401 F.3d at 521-22.  When the correct standard is applied, it is clear that the HOD erroneously denied ESY services.

The HOD declined to order ESY services because it erroneously concluded there was only "scant" evidence of regression, and no "significant regression in any skill." AR at 36.  However, under the correct standard, plaintiffs need not demonstrate of actual regression to be entitled to ESY services.  *See Johnson v. District of Columbia*, 873 F. Supp. 2d 382, 386 (D.D.C. 2012). Rather, "the likelihood that a student will regress can be established by expert testimony." *Id*.  Thus whether plaintiffs establish likelihood of regression or actual regression, "ESY Services are required under the IDEA only when such regression will substantially thwart the goal of meaningful progress." *Johnson*, 873 F. Supp. 2d at 386 (D.D.C. 2012).  The HOD failed to acknowledge and analyze the appropriateness of ESY services under the "meaningful progress" standard given evidence of actual regression and additional evidence that TF would regress, and thus the HOD should not receive any deference because it imposed an improper burden on TF.

Contrary to the HOD's claim of "scant evidence," TF's entitlement to ESY services is established in the record by expert testimony, TF's earlier IEPs providing for ESY services, and an OSSE representative's admission in a mandated meeting by the HOD. *First*, Dr. Kogon, an expert in special education with more than ten years of experience, established that ESY services should have been authorized for TF in the 2022 and 2023 IEPs. AR at 2353-54, 2385. As Dr. Kogon noted ESY services are "for the students who are most at risk, students like [TF] himself." AR at 2384. *See S.H. v. Plano Indep. Sch. Dist.*, 487 F. App'x 850, 866–67 (5th Cir. 2012) (per curiam) (noting that "it is reasonable to expect that [a student diagnosed with autism at the severe end of the scale] would exhibit substantial regression that cannot be recouped within a reasonable period of time"). Dr. Kogon testified that in the 4.5 years she worked at DCPS, she never saw a student in a self-contained class, like TF, not qualify for ESY. AR at 2385. Given that ESY is appropriate "[w]hen students have demonstrated stagnation in skills, regression in skills, when students are in self-contained programs and are identified with significant disabilities and learning disabilities and challenges," and TF is "performing at a pre-kindergarten level at the ages of 18 and 19 years old," Dr. Kogon concluded in her expert opinion that ESY services are appropriate here. AR at 2384-85.

The HOD, however, improperly disregarded Dr. Kogon's expert testimony by mistakenly claiming that her expert opinion was "solely based on [TF]'s functional level," and her experience with students of that level, instead of being specific to TF. AR at 36. The HOD overlooked evidence to the contrary in the record which supports that Dr. Kogon's testimony was highly individualized to TF. Dr. Kogon reviewed thousands of pages of documentation regarding TF's education and disabilities. AR at 2357. In addition, Dr. Kogon consulted with TF's guardian and

speech language pathologist. *Id.* Her expert opinion also included specific findings based on TF's academic progress as detailed in the IEPs—an appropriate source of evidence of likely regression.

Additionally, as no DCPS witness spoke in detail regarding TF's actual progress or lack thereof in academic subjects, TF's baseline levels, and DCPS's goals for his math, reading, and adaptive living skills in the 2022 and 2023 IEPs, the HOD should have credited Dr. Kogon's testimony regarding what would constitute "meaningful progress" for TF. *Johnson*, 873 F. Supp. 2d at 386; AR at 2445-46. DCPS offered testimony from Ms. Africa Battle regarding TF's academic progress during the period covered by the IEPs, as she "had co-taught in Student's classroom," (AR at 36). But HOD's reliance on Ms. Battle's testimony is misplaced because she did not testify with specificity about his academic progress and DCPS did not put on a witness who actually taught TF during the school years in question. AR at 2546-47.

*Second*, the "inclusion of ESY services in [previous IEPs] supports [the] need for ESY services because such services are only provided when they are necessary for a FAPE." *Annette K. v. Hawaii*, 2013 WL 1213118, at *7 (D. Haw. Mar. 22, 2013). As the HOD noted, TF was previously prescribed ESY services in his 2015, 2019, and 2020 IEPs. AR at 10, 13, 36. There is ample evidence in the record that TF's significant needs with respect to such educational services did not change from 2020 to the subsequent school years in question. *See* AR at 102 (DCBH evaluation), 126-29 (2022 IEP), 218-222 (2023 IEP). Indeed, DCPS witnesses did not contest this. Even Ms. Reda, a placement manager from OSSE, acknowledged that TF needed ESY services at the September 29 Meeting. Feldman Decl. ¶ 17; Ex. 1 at pdf p. 6.

Accordingly, this Court should reverse and find TF was entitled to receive ESY Services and should receive compensatory education to remedy the improper denial of ESY.

VI.    **THE HOD ERRED IN UPHOLDING THE IEPS' TRANSITION SERVICES PLANS**

The IDEA mandates appropriate transition services be provided to students starting at the first IEP after a student has turned 16.  20 U.S.C. § 1414(d)(1)(A)(i)(VIII).  Specifically, the IEP must include (1) "***appropriate measurable postsecondary goals*** based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills" **and** (2) "the transition services (***including courses of study***) needed to assist the child in reaching those goals."  *Id.*

The HOD did not engage in the analysis required by the IDEA regarding transition services.  The HOD did <u>*not*</u> make any findings as to whether, for either IEP at issue, the transition services provided "appropriate, measurable post-secondary goals," and the "services, (including courses of study) needed to assist the child in reaching those goals."  20 U.S.C. § 1414(d)(i)(A)(i)(VIII).  This statutory standard is widely applied.  *See Perkiomen Valley Sch. Dist. v. R.B.*, 533 F. Supp. 3d 233, 250 (E.D. Pa. 2021); *Carrie I. v. Dep't of Educ.*, 869 F. Supp. 2d 1225, 1243 (D. Haw. 2012).  The HOD's failure to apply the statutory standard constitutes reversible error, and eliminates any possible deference that is owed to the HOD.  *Reid*, 401 F.3d at 521.

TF's claim that the transition services provided under the 2022 and 2023 IEPs were inadequate must be evaluated in the context of the IEPs as a whole. *See Patterson v. District of Columbia*, 965 F. Supp. 2d 126, 131 (D.D.C. 2013) (in evaluating transition services "[c]ourts have held that where the IEP as a whole confers an educational benefit, an inadequate transition plan does not amount to denial of a FAPE.").  The transition services included in the 2022 and 2023 IEPs, when evaluated in the context of the IEPs as a whole, did not contain appropriate measurable postsecondary goals or the services, including courses of study, needed to help TF reach those goals.  The 2022 IEP Post-Secondary Transition Plan states as a "measurable annual

transition goal" that "By the end of the I.E.P. year with clear guided instruction, [TF] will explore requirements for two (2) vocational training programs that will assist him in becoming a Maintenance Helper for 100% accuracy." AR at 137. The "transition services for post-secondary education and training" lists as the sole service for this goal, "access to computer and internet with teacher supports" for one hour per year. *Id.* The 2023 IEP Post-Secondary Transition Plan states as a "measurable annual transition goal" that "By the end of the I.E.P. year, and with clear and guided instructions, [TF] will research two (2) daily tasks of a Custodian for 100% accuracy." AR at 229. The "transition services for employment" lists as the sole service, "Career Counseling," for one hour per year. AR at 229.

Viewing the transition services offered to TF in the context of the deficient 2022 and 2023 IEPs, it is clear that the transition services provided are inadequate and deprived TF of a FAPE because he lacked the skills and ability to reach those goals or utilize the services that were supposedly available. The HOD specifically found that DCPS failed to provide TF a FAPE because "the IEPs were not reasonably calculated to enable Student to make appropriate progress in the areas of math, reading, adaptive/daily living skills, and speech and language. In addition, the IEPs were deficient because they did not provide Student [assistive technology]." AR at 43.

The HOD's finding on transition services cannot be reconciled with its conclusion that the IEPs denied TF a FAPE. The transition goals for the 2022 and 2023 IEPs required a level of skill in reading and reading comprehension that the record demonstrates TF does not currently possess. AR at 2374-78, 2550. "Research," (AR at 229) therefore, cannot be an appropriate goal for TF. Moreover, the IEPs were deficient with respect to the adaptive/daily living skills that witnesses testified were crucial to successful post-secondary, independent life. *See* AR at 2379-82. Dr. Kogon testified that targeted employment is not realistic given TF's inability to read. AR at 2404.

TF's deficit concerning the necessary adaptive/daily living skills is confirmed by the record. TF indicated he cannot use a computer or the internet, does not have knowledge of nutrition, cannot identify an emergency or make an appointment for himself, and cannot advocate for himself. AR at 107-120. These issues, among others, have resulted in TF having little confidence he will be able to navigate life after high school. AR at 120. Dr. Kogon testified that TF "mostly doesn't know and [doesn't] believe that he can influence how his life turns out" and that he "mostly is not able to describe his vision for himself as a successful adult, and he does not feel ready at all for the next phase of his life." AR at 2394. The IEP's failure to provide a transition services plan that addresses TF's deficits in independent living skills must be found deficient.

Additionally, the inadequacy of the transition services is further confirmed by DCPS's failure to facilitate TF's development of communication skills, which witnesses testified are crucial for his post-secondary transition success. As discussed above, the record is replete with examples of DCPS failing to develop TF's communication skills such that he cannot take advantage of the limited transition services Roosevelt offers. TF was rejected from a summer program at River Terrace because he did not have the requisite skills, particularly communication skills. AR at 2581. TF could not participate in the vocational program DCPS placed him in last summer because TF could not navigate the virtual program on his own. AR at 2456-57. The HOD's findings regarding TF's denial of a FAPE show that TF did not possess the skills to use the transition services plans in the IEPs. Accordingly, the Court should reverse the HOD's finding that TF was not denied a FAPE due to insufficient transition planning.

As relief for the denial of FAPE, the Court should order that TF receive 150 hours of vocational support. Dr. Kogon testified that 150 hours is reasonable because "there has been a complete absence of this programming and support for [TF]." AR at 2404-05. An award of 150

hours would help TF develop vital skills like self-advocacy, financial literacy, understanding of

basic health care, and the ability to write a resume and interview for a job, which would help TF

qualify for a vocational program that meets his interests and where he will be successful. AR at

2404-05.

## CONCLUSION

For all of the foregoing reasons, the Court should permit TF to supplement the record, grant

TF summary judgment, grant TF the relief requested, including, but not limited to private

placement, and permit TF to seek attorneys' fees and costs for this appeal.[6]

Dated:  May 16, 2024

<div style="margin-left:40%">

Respectfully submitted,

/s/ *William B. Jaffe*
WILLIAM B. JAFFE
D.C. Bar No. 502399
LAW OFFICE OF WILLIAM B. JAFFE, P.L.L.C.
708 Highland Avenue NW
Washington, D.C. 20012
Phone: (202) 290-0454
Email: wjaffe@gmail.com


David M. Morris (*pro hac vice*)
Justin J. Santolli (*pro hac vice*)
Ashley A. Czechowski (*pro hac vice*)
Samantha Kobor (*pro hac vice*)
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza

</div>

---

[6]     "Because the Plaintiff[] [has] prevailed on [its] motion for summary judgment, the Court concludes that the [Plaintiff is] entitled to reasonable attorneys' fees and costs." *N.G.*, 556 F. Supp. 2d at 40.  TF's counsel is already entitled to attorneys' fees with respect to the due process hearing as a "prevailing party," and plans to make a separate submission regarding attorneys' fees for the entire case that includes both the administrative component (including the due process hearing) as well as this appeal.  *See B.D. ex rel. Davis v. District of Columbia*, 548 F. Supp. 3d 222, 233 (D.D.C. 2020) ("Because plaintiffs could prevail further on remand if the hearing officer determines that B.D.'s 'current educational placement' also included related services, the appropriate amount of attorneys' fees may also change.").

New York, New York 10004
Phone: (859) 212-8000
david.morris@friedfrank.com
justin.santolli@friedfrank.com
ashley.czechowski@friedfrank.com
samantha.kobor@friedfrank.com

*Counsel for Plaintiff*