**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| T.F., BY HIS GUARDIAN, LISA ELLERN-FELDMAN,<br><br>　　　　*Plaintiff,*<br><br>　　v.<br><br>DISTRICT OF COLUMBIA,<br><br>　　　　*Defendants*. | Civil Action No. 1:23-cv-03612 (CJN) |

**<u>MEMORANDUM OPINION</u>**

    T.F. is a severely autistic 21-year-old DCPS student who has received special education services under the Individuals with Disabilities Education Act since 2008.  In 2023, through his court-appointed guardian, he filed a challenge to his then two most recent individualized education programs, arguing that they denied him the "free appropriate public education" to which he is entitled under the IDEA.  A Hearing Officer largely found for T.F., but T.F. remained unsatisfied with two adverse liability determinations and the relief he obtained.  He therefore filed this suit and subsequently moved for summary judgment, seeking reversal of those liability determinations and an order granting him additional compensatory education and placement at a private school. The District cross-moved for summary judgment on these issues.

    For the reasons below, the Court agrees that the Hearing Officer erred in upholding the two substantive provisions of the IEPs that T.F. challenges, and will remand for the Hearing Officer to reconsider and/or re-explain his remedial award in light of this Opinion.  The Court will accordingly grant in part and deny in part T.F's motion for summary judgment, and will deny the District's.

## I.    Background

### A.    Statutory Framework

The IDEA conditions federal funding for state and local schools on their maintenance of "policies and procedures ensuring that a 'free appropriate public education [(FAPE)] is available to all children with disabilities . . . between the ages of 3 and 21, inclusive.'" *D.C. v. Doe*, 611 F.3d 888, 890 (D.C. Cir. 2010) (quoting 20 U.S.C. § 1412(a)(1)(A)).  D.C. law extends the requirement to provide a FAPE through age 22. *See* D.C. Mun. Regs. Tit. 5–A. § 3001.1.  "A FAPE is the IDEA's core guarantee, and provides a disabled child with both a special education and the related services necessary for her to benefit from that special education." *Pierre-Noel on behalf of K.N. v. Bridges Pub. Charter Sch.*, 113 F.4th 970, 974 (D.C. Cir. 2024) (citations and quotation marks omitted); *see also* 20 U.S.C. §§ 1401(9), (26), (29).  "The provision of a FAPE must be 'in conformity with the [child's] individualized education program,' or IEP," which "is the means by which special education and related services are tailored to the unique needs of a particular child." *Id.* at 974–75 (quoting 20 U.S.C. § 1401(9)(D)).  "An IEP must be in place for each disabled student '[a]t the beginning of each school year,' and must outline a comprehensive plan to meet the child's 'educational needs.'" *Id.* at 975 (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(II), (d)(2)(A)).

### B.    Factual Background

T.F. is a 21-year-old male with Autism Spectrum Disorder (ASD) who has attended Roosevelt High School since December 2019.  AR 97, 1349–52.  T.F. has significant cognitive and social limitations.  A 2021 psychiatric evaluation conducted by the D.C. Department of Behavioral Health described T.F. as functioning "at a first-grade level" and "requir[ing] maximum

support within the classroom and constant redirection to task."[1]  AR 96–98.  A 2023 evaluation administered by DCPS similarly found him to be at a kindergarten level in math—meaning that he could count and write whole numbers only up to 20—and a pre-kindergarten level in reading—meaning that he could read and recite only "some" letters of the alphabet but could read and write his first and last name.  AR 156, 158, 162.  That evaluation also noted that T.F. has "severe deficits in receptive, expressive, and social language skills," including "poor" intelligibility during conversational speech, and found that he demonstrated unawareness of numerous "critical survival skills," such as water safety, poison prevention, and whom to avoid in social situations.  AR 163, 182.

Given T.F.'s profound disabilities, and pursuant to the IDEA, DCPS has deemed T.F. eligible for special education services since 2008 and has provided him with various IEPs over the course of his enrollment at Roosevelt High School.  AR 6; *see* AR 1323 (March 2020 IEP); AR 1743–60 (March 2021 IEP).  At issue in this case are the IEPs that DCPS furnished to T.F. during the 2021–2022 and 2022–2023 school years—the 2022 and 2023 IEPs, respectively.  *See* ECF No. 30 (Pl's Mot.) at 7.

The 2022 IEP was issued when T.F. was 18.  AR 123.  It identified four "areas of concern"—math, reading, communication, and daily living skills—and established various "annual goals" within those areas.  AR 126–31.  In math, for instance, it was proposed that by the end of the IEP year T.F. would "demonstrate the ability to add single digit numbers without regrouping for 75% accuracy in 3/4 opportunities" and "count up to 25 in sequence with 80% accuracy, in (4) out of (5) opportunities."  AR 126.  The IEP stated that T.F. "demonstrates

---

[1] The 2021 psychiatric evaluation was conducted pursuant to a D.C. Superior Court order, after T.F.'s mother abandoned him at a local hospital and he was placed in the care of the D.C. Department of Child and Family Services.  AR 96, 100–01, 2453–54.

difficulties attending to task" and asserted that, in order to make progress on his goals, T.F. would "require[] maximum support from [his] teacher" and "guided and clear instructions, i.e., modeling and practice while performing his individualized lessons." AR 129. The IEP also noted that T.F.'s "communication deficits impact his ability to understand, learn and use new concepts, answer questions[,] and communicate needs, wants[,] and ideas . . . with his peers and teachers." AR 130.

To those ends, the 2022 IEP provided T.F. with 20 hours per week of specialized instruction and 30 minutes per month of speech pathology services, both "outside of the general education setting." AR 133. The IEP also proposed as his "post-secondary transition plan" that, upon graduating from high school, T.F. would live in an assisted living community and "attend a training program to become a Maintenance Helper." AR 137–39. By the end of the IEP year, T.F. was to "explore requirements for two (2) vocational training programs that will assist him in becoming a Maintenance Helper"; "research two (2) daily tasks of a Maintenance Helper"; and "continue to research assisted living communities in his area." AR 137–39. Although T.F.'s 2019 and 2020 IEPs had included "extended school year" (ESY) services, or educational programming during the summer vacation, the 2022 IEP did not. AR 13, 36, 135. The 2022 IEP also stated that T.F. did "not require assistive technology devices or services in order to access the curriculum." AR 125.

T.F.'s IEP team convened for an IEP Annual Review Meeting in March 2023, when T.F. was 19, and subsequently issued his 2023 IEP.[2] AR 170, 214. The areas of concern in the 2023 IEP were the same as those in the 2022 IEP, and the annual goals in each area were largely the same, too. Regarding communication, for example, both IEPs proposed that T.F. be "introduced

---

[2] DCPS issued the first 2023 IEP in April 2023, *see* AR 11, but in May 2023 amended that IEP to "meet the [Office of the State Superintendent of Education (OSSE)] transition requirements." AR 214. The May 2023 IEP, not the April 2023 IEP, is thus the operative 2023 IEP here.

to when and where questions." AR 131, 221. And the only change in T.F.'s math goals was that whereas the 2022 IEP's goal was for T.F. to count to 25, the 2023 IEP's goal was for him to count to 35. AR 126, 216–17. The 2023 IEP's post-secondary transition goals were also the same as those in the 2022 IEP, although "Custodian" was substituted in place of "Maintenance Helper." AR 137–39, 228–30.

Notably, T.F.'s reading skills appeared to have regressed from the 2022 IEP to the 2023 IEP: whereas the former described T.F.'s reading comprehension abilities as "kindergarten level," the latter characterized them as "pre-K level." AR 127, 218. Nonetheless, the 2023 IEP, like the 2022 IEP, granted T.F. 20 hours per week of instruction outside the general classroom without a dedicated aide, ESY services, or assistive technology. AR 215, 223–24, 226. The 2023 IEP did, however, increase T.F.'s speech pathology services from 30 to 90 minutes per month. AR 223–24.

### C.    Procedural History

After the 2023 IEP was finalized, T.F. through his court-appointed guardian, Lisa Ellern-Feldman, filed an administrative complaint alleging that the 2022 and 2023 IEPs were insufficient to enable his educational progress and thus denied him a FAPE. *See* AR 259–89. After a four-day due process hearing at which witnesses for both T.F. and DCPS testified, a Hearing Officer at the Office of the State Superintendent of Education (OSSE) found for T.F. in significant part, concluding that the IEPs were deficient because "neither [] was reasonably calculated to enable [T.F.] to make appropriate progress in math, reading, adaptive/daily living skills, and speech and language." AR 4, 8 & n.6, 27–28. The Hearing Officer also found the IEPs deficient because they did not provide T.F. with access to appropriate "assistive technology," and further noted that DCPS

had not timely evaluated whether T.F. in fact needed such technology.  AR 28, 40.  According to the Hearing Officer, each of these failings amounted to a "denial[] of FAPE."  AR 43.

But the Hearing Officer also rejected some of T.F.'s objections to the IEPs.  Most relevant here, the Hearing Officer found insufficient evidence to conclude that either the 2022 or 2023 IEP denied a FAPE because it failed to prescribe ESY services or because of its purportedly inadequate transition plan.  AR 36–37.  The Hearing Officer also did not deem the IEPs deficient on the grounds that they failed to provide behavior support services or assign T.F. to a private placement, or due to their alleged failures to consider his full educational record and adequately "identify, evaluate and program for T.F.'s intellectual disability."  AR 34–35, 37–38.  Nor, finally, did the Hearing Officer conclude that DCPS had failed to timely and comprehensively conduct certain speech-language and psychoeducational assessments of T.F.  AR 40–43.

As a remedy for the denials of FAPE that he did find, the Hearing Officer ordered DCPS to (1) authorize T.F. to obtain independent psychoeducational, vocational, and assistive technology evaluations at DCPS-prescribed rates; (2) convene an IEP meeting to review the results of those evaluations and update T.F.'s IEP as appropriate; and (3) provide T.F. with "compensatory education" in the form of 100 hours of independent tutoring and 25 hours of independent speech and language pathology.  AR 44.  The Hearing Officer also directed DCPS to convene an "IEP team/placement meeting with an appropriate OSSE representative to review [T.F.'s] placement and consider whether [he] needs a non-public placement."  AR 44.  Although the Hearing Officer was "not convinced that [T.F.] cannot be served appropriately at [Roosevelt High] when [an] appropriate IEP is developed," he was "concern[ed]" by the testimony of T.F.'s guardian that T.F.'s case manager had "stated to her that there was nothing else that [Roosevelt] had to offer [T.F.]."  AR 37–38. Given that testimony, as well as the fact that T.F. had previously planned to

transfer to a different DCPS program, the Hearing Officer deemed it "appropriate for an IEP team consider whether [T.F.'s] educational placement or location of services should be changed." AR 38.

That IEP meeting took place on September 29, 2023, and Ms. Ellern-Feldman (who was present along with T.F.'s attorney and educational expert) reiterated there her request that T.F. be assigned to a private placement. ECF No. 30-3 (Feldman Decl.) ¶¶ 7, 8–9, 13. The OSSE representative, Katie Reda, explained that OSSE's role was only to make a placement "recommendation" to DCPS, which DCPS was free to accept or reject. ECF No. 30-4 at 2. Ms. Reda ultimately did not recommend private placement, but did not offer a rationale for her decision. *Id.* at 6–7; Feldman Decl. ¶ 19. Ms. Reda did, however, note that T.F. should receive ESY services. ECF No. 30-4 at 6; Feldman Decl. ¶ 17. At the end of the meeting, DCPS adopted Ms. Reda's recommendation and did not order private placement.[3] Feldman Decl. ¶¶ 21–23; ECF No. 30-4 at 6–7.

T.F. commenced this action in November 2023 and moved for summary judgment in May 2024. T.F's motion challenges two aspects of the Hearing Officer's liability determination that were adverse to him: the conclusions that the 2022 and 2023 IEPs did not deny a FAPE by failing to provide ESY services or by providing transition plans that T.F. alleges were inadequate. Pl's Mot. at 4–5. T.F. also challenges the Hearing Officer's remedy determination. He argues that the

---

[3] In July 2024, after T.F. had spent another school year at Roosevelt, DCPS sent Ms. Ellern-Feldman a letter informing her that T.F.'s enrollment would be changed to River Terrace EC for the 2024–2025 school year. *See* ECF No. 33-2; ECF No. 33-1 (Second Feldman Decl.) ¶ 3. River Terrace is a public school in the District of Columbia that serves only students with learning disabilities. Second Feldman Decl. ¶ 4. But that letter was apparently "sent in error," and DCPS later sent Ms. Ellern-Feldman "a new location of services letter . . . for Roosevelt." ECF No. 37 (Def's Reply) at 6.

Hearing Officer should have awarded private placement directly, instead of purportedly "delegating" that question to DCPS, and should have awarded the full amount of compensatory education that T.F.'s educational expert proposed—400 hours of academic tutoring, 108 hours of speech therapy, and 150 hours of vocational support, all to be used anytime before T.F. turns 25. *Id.* at 3–4, 29.  The District cross-moved for summary judgment, arguing that the Hearing Officer's decision should be upheld in full.[4]  *See generally* ECF No. 31 (Def's Mot.).

## II.    Legal Standard

When, as here, a party seeks review of the decision of an IDEA Hearing Officer "by way of a summary judgment motion," the court does not "apply[] the typical standard applicable to a summary judgment motion." *L.R.L. ex rel. Lomax v. D.C.*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012).  Instead, the court simply "conducts a summary adjudication" based on the administrative record and any "additional evidence" that the parties proffer and the Court in its discretion chooses to consider.[5]  *Id.* at 73–74; *see also Reid v. Dist. of Columbia,* 401 F.3d 516, 521–22 (D.C. Cir. 2005).

---

[4] Although T.F.'s motion for summary judgment contained a statement of material facts, the District's cross-motion did not include such a statement or a separate statement responding to T.F.'s.  T.F. urges that the District's failure to provide either document violated Local Civil Rule 7(h)(1) and that the Court should accordingly "deem T.F.'s statement of material facts as admitted" or even grant his motion for summary judgment in full.  ECF No. 33 (Pl's Reply) at 8–9.  But the Court is not persuaded that Local Civil Rule 7(h)(1) applies to administrative review actions under the IDEA, even in cases in which the Court accepts additional evidence beyond the administrative record.  The Court thus sees no reason to exercise its discretion to impose the harsh sanctions that T.F. requests.  And in any event, there do not appear to be any material factual disputes here that competing factual statements would have helped highlight.

[5] Both parties ask the Court to consider additional evidence.  T.F. asks the Court to consider three pieces of supplemental evidence concerning the September 2023 meeting with DCPS and OSSE: a declaration from T.F.'s guardian, a declaration from T.F.'s expert witness, and DCPS's notes from the meeting.  *See* Pl's Mot. at 17–18.  The District also asks the Court to consider three pieces of evidence that postdate the Hearing Officer's decision: T.F.'s 2024 IEP, an October 2023 assistive technology evaluation for T.F., and a November 2023 psychological evaluation of T.F.  *See* Def's Mot. at 17 n.2.  Although the District does not object to the Court considering T.F.'s evidence, *id.*, T.F. does object to the Court considering the District's.  *See* Pl's Reply at 22–24.  Because all this evidence concerns events that occurred after the administrative hearing and is

In that adjudication, "[t]he party challenging the administrative decision has the burden of proving deficiencies in the administrative decision by a preponderance of the evidence." *Lomax*, 896 F. Supp. 2d at 73 (citing 20 U.S.C. § 1415(h)(i)(2)(C)(iii)). "While the court must make an independent determination" as to the issues in dispute, it "also should give 'due weight' to the decision of the hearing officer and should afford some deference to the expertise of the hearing officer and the school officials." *D.K. v. District of Columbia,* 983 F. Supp. 2d 138, 144 (D.D.C. 2013). "However, the Court affords less deference to [hearing officer decisions] in the context of [the] IDEA than is conventional in administrative proceedings," *Wade v. D.C.*, 322 F. Supp. 3d 123, 130 (D.D.C. 2018), and a decision "without reasoned and specific findings deserves little deference." *Reid*, 401 F.3d at 521. If the court finds that the hearing officer's decision was erroneous, it may "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(h)(i)(2)(C)(iii).

## III. Analysis

### A. Liability

As noted above, T.F. argues that the Hearing Officer erred with respect to two liability findings: that the March 2022 and May 2023 IEPs (1) did not improperly deny T.F. ESY services and (2) contained adequate transition plans. Pl's Mot. at 35–41. For the reasons below, the Court agrees that the Hearing Officer should have additionally found the IEPs deficient in both of those regards.

---

plausibly relevant, the Court will consider the parties' submissions alongside the administrative record. *See Fullmore v. District of Columbia*, 40 F. Supp. 3d 174, 180 (D.D.C. 2014). But the Court would reach the same decision in this matter based on the administrative record alone.

1.    **ESY Services**

ESY services are "necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months." *Johnson v. D.C.*, 873 F. Supp. 2d 382, 386 (D.D.C. 2012). "[T]he likelihood that a student will regress can be established by expert testimony." *Id.* Here, neither the 2022 IEP nor the 2023 IEP provided T.F. with ESY services. But the Hearing Officer declined to find the IEPs deficient on that basis, explaining that, "[a]lthough [T.F.] had ESY in previous IEPs, the evidence does not demonstrate significant regression in any skill." AR 36; *see also id.* ("There was scant evidence that [T.F.'s] skills regressed during absences from formal school instruction.").

By suggesting that evidence of actual, significant regression was required for T.F. to qualify for ESY services, the Hearing Officer placed too high an evidentiary burden on T.F. The appropriate inquiry is not whether a student has already regressed, but instead whether the student is *likely* to regress without ESY services, thereby "significantly *jeopardiz[ing]*" his educational gains during the school year. *Johnson*, 873 F. Supp. 2d at 386 (emphasis added). A preponderance of the evidence supports the conclusion that T.F.'s progress during the schoolyear was in substantial jeopardy without ESY services, and thus that the Hearing Officer erred in concluding that DCPS's failure to provide ESY services in the 2022 and 2023 IEPs did not deny T.F. a FAPE.[6]

---

[6] The District argued in its cross-motion that "this issue is now moot because DCPS has included ESY in T.F.'s January 31, 2024 IEP." Def's Mot. at 35 (citing ECF No. 31-1 at 18). But in its reply, the District conceded that T.F. "may still seek compensatory education for past alleged denials of FAPE f[rom] DCPS's failure to provide ESY services in T.F.'s challenged IEPs." Def's Reply at 15 n.3. The Court agrees with this statement, as well as with the District's uncontroversial statement that T.F. may not seek prospective relief regarding ESY services because his "past IEPs no longer have operative force, can no longer be modified, and have already been replaced." *Id.*

As T.F.'s expert, Dr. Kogon, testified at the due process hearing, ESY services are "for the students who are most at risk, [] like [T.F.] himself."  AR 2384.  It is undisputed that T.F. was "performing at a pre-kindergarten level at the ages of 18 and 19."  AR 2384–85.  And Dr. Kogon stated that, in the 4.5 years she had worked at DCPS, she had never seen a student who was instructed outside the general classroom, like T.F., not qualify for ESY education.  AR 2385. Common sense suggests that a student with cognitive limitations as severe as T.F.'s would require summertime support in order to make "meaningful progress" toward his learning goals.  *Johnson*, 873 F. Supp. 2d at 386.  The District argues that this logic assumes T.F. should receive "generalized programming based on what other students receive," thereby violating the IDEA's directive that special education services be "'tailored to the unique needs' of a particular child."  Def's Mot. at 34 (quoting *Board of Educ. of Henrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982)). But it is simply "reasonable to expect that [a student with severe autism] would exhibit substantial regression [over the summer] that cannot be recouped within a reasonable period of time."  *S.H. v. Plano Indep. Sch. Dist.*, 487 F. App'x 850, 866–67 (5th Cir. 2012) (per curiam) (upholding district court's determination that severely autistic child was entitled to ESY services "[e]ven though there was no specific data documenting actual regression during breaks from instruction").

Indeed, the record confirms that common sense conclusion here.  Comparing T.F.'s 2022 and 2023 IEPs reflects obvious stagnation in his educational trajectory.  As just one example, T.F. was apparently able to recite only two more numbers in 2023 than he could in 2022—it took him a year to learn "8" and "9."  AR 126, 216.  And the 2023 IEP explicitly assessed T.F.'s reading comprehension skills as lower than the 2022 IEP did—at a pre-kindergarten versus kindergarten level.  AR 127, 218.  The Hearing Officer appears to have concluded that this documented backsliding was "scant evidence" of summertime regression.  AR 36.  But that characterization is

difficult to square with the IEPs themselves, which show almost no progress between the 2022 and 2023 school years. And in any event, even a little evidence of actual *regression* is strong evidence that *progress* would be "significantly jeopardized" without ESY services—which is the applicable legal standard and the standard to which Dr. Kogon's testimony was addressed. *See, e.g.*, AR 2384 (Dr. Kogon explaining that the goal of ESY is to ensure that "learning doesn't fall further behind").

The Hearing Officer also discounted Dr. Kogon's testimony on the grounds that it "was not based on any personal knowledge of [T.F.]," and rather was "based solely on [T.F.'s] functional level and her experience that students at that functional level typically are provided ESY services." AR 36. The Hearing Officer credited instead the testimony of DCPS's witness, Ms. Africa Battle, who "co-taught in [T.F.'s] classroom, worked closely with [T.F.], [and] participated in arranging [his] transition services." *Id.* According to Ms. Battle, "when [T.F.] reached the age of majority, [he] needed summer employment" as opposed to ESY services in order to "assist in developing [his] long-term employment skills." AR 36.

But the Hearing Officer's critiques of Dr. Kogon's testimony were overstated. Dr. Kogon testified that, in preparing for the due process hearing, she had reviewed at least "2,000 pages of information" about T.F. and his education, and had consulted with his guardian and his speech language pathologist. AR 2357. Dr. Kogon's testimony also made specific findings based on T.F.'s IEPs, which were of course tailored to T.F. and not ready-made for any student at his same functional level. *See, e.g.*, AR 2365–66 (testifying that a comparison of T.F.'s IEPs reflected he was "not making progress").

Nor was Ms. Battle's testimony particularly persuasive on the ESY services issue. To start, Ms. Battle focused on what was needed to "develop[]" T.F.'s employment skills over the summer, but as she herself testified, "ESY is principally to address and prevent a student's skill *regression*."

AR 36 (emphasis added).  Ms. Battle did not testify that T.F.'s employment-related skills were in danger of regressing, nor did her testimony specifically address T.F.'s academic progress—as to which the record did reflect regression.  *See* AR 2533.  Moreover, even if it were permissible to withhold necessary ESY services on the basis that a student would receive a greater benefit from *other* summer programming—a proposition for which the District offers no legal support—the programming DCPS offered T.F. was hardly a fair substitute.  Ms. Battle testified only that she "believed" T.F. was working during the summer of 2022.  AR 2544.  And whereas Ms. Battle testified that T.F. "definitely . . . made it to work" in summer 2023, T.F. had in fact been "assigned to a virtual summer program" that he was wholly unable to use.  AR 36, 2456–57, 2544.

Finally, "[t]he inclusion of ESY services in . . . previous IEPs [] supports [the] need for ESY services because such services are only provided when they are necessary for a FAPE." *Annette K. v. Hawaii*, 2013 WL 1213118, at *7 (D. Haw. 2013).  As the Hearing Officer noted, T.F. was prescribed ESY services in both his 2019 and 2020 IEPs with DCPS.  AR 36.  The record reflects no change in T.F.'s educational needs from 2019 to 2022, nor has the District ever argued that such change took place.  To the contrary, at the September 2023 placement meeting, the OSSE representative expressly stated that T.F. requires ESY services, and T.F.'s 2024 IEP now provides them.  ECF No. 30-4 at 6; ECF No. 31-1 at 19.  The inclusion of ESY services in these other IEPs (both before and after the IEPs in question) further confirm that DCPS denied T.F. a FAPE by failing to provide him with ESY services in 2022 and 2023.

### 2.    Transition Services

The IDEA requires all IEPs issued after a student turns 16 to include (1) "appropriate measurable postsecondary goals based upon age appropriate transition assessments" and (2) "the transition services (including courses of study) needed to assist the child in reaching those goals."

20 U.S.C. §§ 1414(d)(1)(A)(i)(VIII)(aa), (bb).  T.F.'s 2022 IEP, which was issued when he was 18, stated three "measurable annual transition goals":  that T.F. would (1) "explore requirements for two (2) vocational training programs that will assist him in becoming a Maintenance Helper"; (2) "research two (2) daily tasks of a Maintenance Helper"; and (3) "research assisted living communities in his area."  AR 137–39.  The "transition services" accompanying those goals were listed as one hour per year each of "Access to computer and internet with teacher supports"; "Special Education Teacher Support"; and "Independent Living Skills Services and Instruction." AR 137–39.  The transition goals in T.F.'s 2023 IEP were identical to those in the 2022 IEP, but substituted "Custodian" for "Maintenance Helper."  AR 228–30.  In the 2023 IEP, the relevant "transition services" were "Vocational Training," "Career Counseling," and "Training on Independent Living Skills," again for one hour per year each.  AR 228–30.

The Hearing Officer's analysis of the transition services provided in the 2022 and 2023 IEPs focused primarily on the "transition assessments" underlying them.  The Hearing Officer noted that "[t]he evidence demonstrates that [T.F.'s] post-secondary transition plan was developed based on assessments that provided [T.F.] with pictures of different jobs and figures of job tasks," and that T.F. was "also provided an independent living assessment to assess what areas needed to be worked on."  AR 36.  Although the Hearing Officer acknowledged Dr. Kogon's testimony that T.F.'s "responses to th[o]se assessments indicated that [he] has little clue and insight regarding employment," the Hearing Officer found Ms. Battle's testimony "far more credible regarding [T.F.'s] interests and the appropriateness of the transition plan."  AR 37.  The Hearing Officer thus concluded that T.F. "had sufficient input in developing the transition plans in the IEPs at issue and that [T.F.] has been and is being provided sufficient transition support under the IEP."  AR 37.

But even if T.F. were provided adequate "age appropriate transition assessments" under the IDEA, it does not follow that the "postsecondary goals" and "transition services" that grew out of those assessments were appropriate.  As the Hearing Officer concluded, the 2022 and 2023 IEPs "were not reasonably calculated to enable [T.F.] to make appropriate progress in the area[] of," among other subjects, "reading."  AR 44.  And the record indeed reflects that T.F. is unable to read or to use a computer on his own.  *See, e.g.*, AR 115, 218.  It is thus unclear how T.F. could "explore," using a "computer," the requirements of certain vocational training programs, or how he could ever "research"—even with the benefit of unspecified "career counseling" and other supports—the daily tasks of a custodian or the offerings of local assisted living facilities.  Surely a goal or service cannot be "appropriate" when a student wholly lacks the skills necessary to even begin using that service or making progress toward that goal.  Indeed, when the Court inquired at oral argument whether the District's counsel found it "unlikely" that someone with the intellectual capacity of a six-year-old could engage with the transition services offered in the 2022 and 2023 IEPs, counsel had essentially no response. *See* ECF No. 39 (Tr.) at 25–26.

It is true that, "where the IEP as a whole confers an educational benefit, an inadequate transition plan [may] not amount to denial of a FAPE."  *Patterson v. District of Columbia*, 965 F. Supp. 2d 126, 131 (D.D.C. 2013).  But that is not the case here.  The Hearing Officer found T.F.'s 2022 and 2023 IEPs deficient not only with respect to their academic offerings, but also with respect to their offerings on daily living skills—the very skills that the transition plans appeared to assume T.F. already possessed.   AR  44.   Meanwhile, a 2022 "post-secondary education assessment" indicated that T.F. is unable to read street signs or grocery signs, do laundry, count money, or tell time independently.  AR 107–20.  T.F. also was rejected from a summer program at a different DCPS school because he lacked the communication skills necessary to participate,

and was similarly unable to participate in a virtual DCPS summer vocational program because he could not navigate the online interface.  AR 2456–57, 2580–81.  The transition plans in the 2022 and 2023 IEPs should have focused on any number of these foundational skills, not more advanced skills like "research," using a computer, that were entirely out of T.F.'s reach.  In the context of the IEPs' other deficiencies, their failure to do so denied T.F. a FAPE.

### B.    Remedy

For these reasons, in addition to denying T.F. a FAPE in the various ways the Hearing Officer did find, T.F.'s 2022 and 2023 IEPs also denied him a FAPE by failing to include ESY services and by providing inadequate transition plans.  As a remedy for those harms, T.F. is entitled to additional "compensatory education, 'i.e., replacement of additional services [he] should have received in the first place.'"  *Brown v. D.C.*, 568 F. Supp. 2d 44, 47 (D.D.C. 2008) (quoting *Reid*, 401 F.3d at 518).

T.F. asks the Court to order that compensatory education today:  he requests 150 hours of vocational support as relief for the inadequate transition plans and an unspecified amount of compensatory education to remedy the improper denial of ESY services.  Pl's Mot. at 37, 40.  But a "district court may determine that [] 'appropriate' relief [under the IDEA] is a remand to the hearing officer for further proceedings."  *Reid,* 401 F.3d at 526.  Here, in light of the "fact-specific exercise of discretion" required to craft a compensatory education award, the Court concludes that the best course of action is to remand this case to the Hearing Officer so he may order in the first instance a remedy that "aim[s] to place [T.F.] in the same position [he] would have occupied but for" DCPS's failure to provide the ESY services and transition plans required by the IDEA.  *Id.* at 518, 524.

On remand, the Hearing Officer should also reconsider the remedy he ordered for the various IDEA violations that he found in his September 2023 decision.  Upon determining that a school district has denied a student a FAPE, "a hearing officer—in the same manner as the Court—is vested with broad discretion to further the IDEA's remedial purposes" by ordering what he deems to be "appropriate" relief.  *D.C. v. Oliver*, 2014 WL 686860, at *4, *6 (D.D.C. 2014).  Still, any award of compensatory education must "rely on individualized assessments" and be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place."  *Reid*, 401 F.3d at 524.  Here, the Hearing Officer stated that, in his view, an award of 100 hours of independent tutoring and 25 hours of independent speech-language pathology was "calculated to provide [T.F.] [the] educational benefit that likely would have accrued from special education services DCPS should have supplied in the first place."  AR 43–44.  But the only explanation the Hearing Officer gave for making that specific award was that he had "reduced" the amount requested by T.F.'s expert because she "requested compensatory services for violations that were not proved."  AR 43.

Even setting aside that the Hearing Officer erred in finding a failure of proof on two of those violations, the Hearing Officer's reasoning also appeared to overlook that many of the claims on which T.F. did not prevail related to wholly procedural violations of the IDEA, such as DCPS's alleged failure to timely evaluate him, or to non-academic violations, such as DCPS's failure to provide allegedly necessary behavioral services.  *See* AR 34, 40–43.  It is not clear how the fact that T.F. was not denied a FAPE in those other ways should result in a decrease in his compensatory education for denials of FAPE in the unrelated domains of math, reading, daily living skills, and speech.  AR 44.  Nor did the Hearing Officer affirmatively explain why the relief

ordered was sufficient to put T.F. in "the educational position he would have been in but for th[ose] FAPE denial[s]," *B.D. v. D.C.*, 817 F.3d 792, 799 (D.C. Cir. 2016), beyond a conclusory statement that his award was "calculated" to that end. AR 43. Accordingly, when crafting a new remedy that also redresses the District's improper transition planning and denial of ESY services, the Hearing Officer should more carefully link his compensatory education award to specific facts in the record, including by analyzing factors such as the length of time T.F. was denied a FAPE, the specific services he was denied, and the progress he could have made absent the District's violations of the IDEA. *See Reid*, 401 F.3d at 524–25.

In conducting that analysis, the Hearing Officer should also reevaluate his conclusion that "there is not sufficient evidence on the record" to warrant that T.F. be permitted to use his compensatory education through age 25. AR 43–44. T.F. is currently scheduled to receive his high school certificate in a year, at age 22. But "[f]ederal courts have consistently held . . . that compensatory education may continue beyond that age to make up for the denial of FAPE during the statutory period." *Anthony v. District of Columbia*, 463 F. Supp. 2d 37, 44 n.6 (D.D.C. 2006). Depending on the total amount of compensatory education the Hearing Officer awards on remand, and considering that over a year has elapsed since the Hearing Officer issued his initial decision, it may no longer be practicable for T.F. to utilize all of his compensatory education before he graduates. If the Hearing Officer finds that is the case, he should extend T.F.'s IDEA eligibility so that T.F. has sufficient time to benefit from the compensation he is owed "for rights that . . . the school district denied him in the past." *Pihl v. Mass. Dep't of Educ.*, 9 F.3d 184, 189 (1st Cir. 1993).

Finally, the Hearing Officer should revisit on remand whether a public placement remains appropriate for T.F in light of the additional violations in the 2022 and 2023 IEPs and the current

record—including his 2024 IEP and any IEP that has been issued for 2025.  As noted, the Hearing

Officer found insufficient evidence to conclude that T.F. "cannot be served appropriately at

[Roosevelt] when [an] appropriate IEP is developed," and thus rejected T.F.'s claim that his public

placement denied him a FAPE.  AR 37–38, 44; *see also* AR 44 (finding "no basis in evidence" to

"[a]ward [T.F.] non-public educational placement"); AR 37 ("[T]here is insufficient [evidence]

that [T.F.'s] IEPs . . . were deficient because they did not prescribe a[] [least restrictive

environment] in a full-time non-public placement.").  Yet, due both to alleged statements by T.F.'s

case manager that Roosevelt had "nothing more to offer" him and to the fact that T.F. had at one

point planned to transfer from Roosevelt to another DCPS school, the Hearing Officer ordered

DCPS to "consider whether [T.F.'s] educational placement or location of services should be

changed, up to and including consideration of a non-public placement."  AR 38.

     As a threshold matter, T.F. argues that the Hearing Officer improperly "delegate[d] the

decision on private placement" to T.F.'s IEP team, creating "reversible error."  Pl's Mot. at 19.

This argument rests on the Court of Appeals' statement in *Reid* that "a hearing officer may not

delegate his authority to a group that includes an individual specifically barred from performing

the hearing officer's functions," including "an employee of the . . . local educational agency

involved in the education or care of the child."  *Id.* (quoting *Reid*, 401 F.3d at 526); *see also* 20

U.S.C. § 1415(f)(3).  But *Reid* concerned the question of whether hearing officers may authorize

IEP teams to "reduce or discontinue" their previously imposed compensatory education awards—

not the question of whether hearing officers, having "declined to order prospective placement in a

private school," may "direct[] the District to review . . . [a student's] IEP, in order to make an

informed decision about his ongoing placement."  *Reid*, 401 F.3d at 526; *Adams v. D.C.*, 285 F.

Supp. 3d 381, 396 (D.D.C. 2018) (quotation marks omitted).  The latter is what happened here, as

the Hearing Officer's repeated statements that he was not ordering private placement confirm. *See, e.g.*, AR 43–44. And courts have repeatedly upheld such relief, which indeed is "not unusual in IDEA cases." *Adams*, 285 F. Supp. 3d at 393 (collecting cases); *see also, e.g.*, *Wade v. D.C.*, 2021 WL 11585179, at *16 (D.D.C. 2021) (distinguishing *Reid* and upholding hearing decision that denied relief and ordered the IEP team to "reconvene to address the alleged deficiencies in [the] IEP"), *report and recommendation adopted*, 2021 WL 3663630 (D.D.C. 2021).

Still, the Hearing Officer when ordering that relief here did not fully lay out his reasoning according to the factors the Court of Appeals has set out for determining whether private placement is appropriate, "including the nature and severity of the student's disability, the student's specialized educational needs, the link between those needs and the services offered by the private school, the placement's cost, and the extent to which the placement represents the least restrictive educational environment." *Branham v. District of Columbia*, 427 F.3d 7, 12 (D.C. Cir. 2005). Instead, the Hearing Officer's analysis focused almost exclusively on the demonstrated improvement in T.F.'s "social skills" while at Roosevelt—but as the Hearing Officer himself found, T.F.'s "specialized educational needs" were largely academic, not behavioral. AR 30–34, 37. The Hearing Officer also appeared to place substantial weight on hypothetical future events, like the subsequent development of an "appropriate IEP" and T.F.'s eventual participation in Roosevelt's "expanded employment and transition opportunities." AR 38. On remand, and with the benefit of new evidence regarding T.F.'s past two school years at Roosevelt, the Hearing Officer should more clearly walk through the *Branham* factors when justifying his decision on private placement, and should base that decision wholly on the current record. The Hearing Officer should also ensure that his analysis applies the appropriate burden of persuasion under District

law, which requires DCPS to show that Roosevelt is an appropriate placement rather than requiring T.F. to show that it is an inappropriate one. *See* D.C. Code § 38-2571.03(6)(A)(i).

## IV.    Conclusion

For the foregoing reasons, the Court concludes that T.F.'s 2022 and 2023 IEPs denied him a FAPE by failing to provide ESY services and adequate transition plans, and that the Hearing Officer's contrary decision was error. The Court accordingly remands this matter to the Hearing Officer for the determination of an award of compensatory education appropriate to remedy those additional violations of the IDEA. On remand, the Hearing Officer should also reassess the remedy ordered in the September 2023 decision, and should further explain the reasoning behind that award to cure the deficiencies outlined in this Opinion.

An Order will accompany this Opinion.


DATE:  March 28, 2025

CARL J. NICHOLS
United States District Judge